## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

INTERNATIONAL BUSINESS MACHINES
CORPORATION,

        Plaintiff,

    v.

ZYNGA INC.,

        Defendant.

Case No. 22-cv-590-GBW

**JURY TRIAL DEMANDED**



## ZYNGA INC.'S OPENING BRIEF IN SUPPORT OF ITS MOTION TO EXCLUDE THE EXPERT TESTIMONY OF DOMINIC M. PERSECHINI

Dated:  April 5, 2024

Alyssa Caridis (admitted *pro hac vice*)
Geoffrey Moss (admitted *pro hac vice*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
355 S. Grand Avenue, Suite 2700
Los Angeles, CA 90071
(213) 629-2020
acaridis@orrick.com
gmoss@orrick.com
jake.oneal@orrick.com

Clement S. Roberts (admitted *pro hac vice*)
Will Melehani (admitted pro hac vice)
Sarah K. Mullins (admitted pro hac vice)
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
(415) 773-5700
croberts@orrick.com
wmelehani@orrick.com
sarahmullins@orrick.com

Brian E. Farnan (Bar. No. 4089)
Michael J. Farnan (Bar No. 5165)
FARNAN LLP
919 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 777-0300
(302) 777-0301 (Fax)
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

Evan D. Brewer (admitted *pro hac vice*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025
(650) 614-7343
ebrewer@orrick.com

Richard F. Martinelli (admitted *pro hac vice*)
Brooks Kenyon (admitted pro hac vice)
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
(212) 506-5000
rmartinelli@orrick.com
bkenyon@orrick.com

*Attorneys for Defendant Zynga Inc.*

## TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................................... 1

II.   FACTUAL BACKGROUND ................................................................................... 1

    A.    Accused Functionality ................................................................................ 2

        1.    Offers for Virtual Items ................................................................. 2

        2.    Third-Party Advertising ................................................................. 3

        3.    Cheating Detection in Empires & Puzzles ................................... 3

    B.    Mr. Persechini's Damages Analyses ......................................................... 3

III.  LEGAL STANDARD ............................................................................................ 5

IV.  ARGUMENT ......................................................................................................... 5

    A.    Mr. Persechini Fails To Tie His Profit Split To The Facts Of The Case. ............. 5

    B.    Mr. Persechini Fails to Apply The Hypothetical Negotiation Framework. ........... 8

        1.    Mr. Persechini's Calculation Is Indistinguishable From A Running Royalty, Which He Contends Neither Party Would Have Agreed To. ................................................................................................... 8

        2.    Mr. Persechini's Damages Analysis For The '719 Patent Puts The Wrong Parties At The Hypothetical Negotiating Table. ......................... 10

        3.    Mr. Persechini Conducted A Backward-Looking Inquiry, Not A Hypothetical, Forward-Looking Exercise. ............................................ 11

    C.    Mr. Persechini's Analysis Fails To Apportion Between Allegedly Infringing And Non-Infringing Game Features And Revenue. ......................... 13

        1.    Mr. Persechini's Damages For Pre-Caching Third-Party Ads Is Based On Unpatented Features And Non-Infringing Ads. ..................... 14

        2.    Mr. Persechini's Damages Calculation For Targeting Third-Party Ads Is Based On The Value Of Unpatented Targeting Techniques And Includes Revenue For Non-Infringing Ads. .................................. 17

        3.    Mr. Persechini's Damages Calculation For Targeting Offers For Virtual Items Is Based On The Value Of Zynga's Targeting Techniques And Includes Revenue For Non-Infringing Offers. ............. 18

        4.    Mr. Persechini's Damages For The '719 Patent Fails To Apportion Between Accused And Unaccused Methods Of Cheating Detection. ................................................................................................ 21

V.   CONCLUSION .................................................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AccuScan, Inc. v. Xerox Corp.*,
   1998 WL 603217 (S.D.N.Y. Sept. 11, 1998), *aff'd in part, rev'd in part on
   other grounds*, 76 F. App'x 290 (Fed. Cir. 2003) ...................................................12

*Aqua Shield v. Inter Pool Cover Team*,
   774 F.3d 766 (Fed. Cir. 2014) ...........................................................................12

*Commonwealth Sci. & Indus. Rsch. Organisation v. Cisco Sys., Inc.*,
   809 F.3d 1295 (Fed. Cir. 2015) ................................................................5, 14, 18

*Daedalus Blue LLC v. SZ DJI Tech. Co.*,
   2022 WL 831619 (W.D. Tex. Feb. 24, 2022) ......................................................11

*Enplas Display Device Corp. v. Seoul Semiconductor Co.*,
   909 F.3d 398 (Fed. Cir. 2018) ..................................................................1, 14, 16

*Ericsson, Inc. v. D-Link Sys., Inc.*,
   773 F.3d 1201 (Fed. Cir. 2014) ...........................................................................20

*Fromson v. W. Litho Plate & Supply Co.*,
   853 F.2d 1568 (Fed. Cir. 1988), *overruled on other grounds by Knorr-Bremse
   Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337 (Fed. Cir.
   2004) .............................................................................................................12, 13

*Good Technology Corp. v. MobileIron, Inc.*,
   2015 WL 4090431 (N.D. Cal. July 5, 2015) ........................................................21

*Hanson v. Alpine Valley Ski Area, Inc.*,
   718 F.2d 1075 (Fed. Cir. 1983) .....................................................................12, 13

*Interactive Pictures Corp. v. Infinite Pictures, Inc.*,
   274 F.3d 1371 (Fed. Cir. 2001) ...........................................................................12

*Intuitive Surgical, Inc. v. Auris Health, Inc.*,
   549 F. Supp. 3d 362 (D. Del. 2021) .......................................................................5

*LaserDynamics, Inc. v. Quanta Comput., Inc.*,
   694 F.3d 51 (Fed. Cir. 2012) .........................................................................10, 11

*Lucent Techs., Inc. v. Gateway, Inc.*,
   580 F.3d 1301 (Fed. Cir. 2009) ..............................................................8, 9, 10, 12

*MLC Intell. Prop., LLC v. Micron Tech., Inc.*,
    10 F.4th 1358 (Fed. Cir. 2021) ..................................................................................13

*Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*,
    30 F.4th 1339 (Fed. Cir. 2022) ...........................................................................14, 17

*Opticurrent, LLC v. Power Integrations, Inc.*,
    2018 WL 6727826 (N.D. Cal. Dec. 21, 2018) ...................................................10, 11

*Probatter Sports, LLC v. Sports Tutor, Inc.*,
    586 F. Supp. 3d 80 (D. Conn. 2022), *aff'd*, 2023 WL 7548208 (Fed. Cir. Nov.
    14, 2023) ...................................................................................................................12

*Sound View Innovations, LLC v. Hulu, LLC*,
    33 F.4th 1326 (Fed. Cir. 2022) ...........................................................................16, 22

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F.3d 1292 (Fed. Cir. 2011).....................................................................................7

*VirnetX, Inc. v. Cisco Sys., Inc.*,
    767 F.3d 1308 (Fed. Cir. 2014)....................................................................... *passim*

*Water Techs. Corp. v. Calco, Ltd.*,
    850 F.2d 660 (Fed. Cir. 1988)......................................................................................5

**Other Authorities**

Fed. R. Evid. 702 ................................................................................................5, 8, 10

**TABLE OF EXHIBITS**

| Exhibit No. | Description | Short Cite |
|---|---|---|
| **Exhibit 1** | Expert Report of Dominic M. Persechini dated February 2, 2024 (Volume 1, Tab 1) | Persechini Op. |
| **Exhibit 2** | Reply Report of Dominic M. Persechini dated March 19, 2024 (Volume 1, Tab 1) | Persechini Reply |
| **Exhibit 3** | Relevant Excerpts from the March 29, 2024 Deposition of Dominic Persechini | Persechini Tr. |
| **Exhibit 4** | Relevant Excerpts from the March 29, 2024 Deposition of Christopher Thompson | Thompson Tr. |
| **Exhibit 5** | Relevant Excerpts from the March 21, 2024 Deposition of Scott Martin, Ph.D. | Martin Tr. |
| **Exhibit 6** | Relevant Excerpts from the January 3, 2024 Deposition of Michael Ballard | Ballard Tr. |
| **Exhibit 7** | Relevant Excerpts from the January 3, 2024 Deposition of Andrew Ice | Ice Tr. |
| **Exhibit 8** | Relevant Excerpts from the December 18, 2023 Deposition of Mikko Wilkman | Wilkman Tr. |
| **Exhibit 9** | Opening Expert Report of Dr. Scott Martin dated February 1, 2024 | Martin Op. |
| **Exhibit 10** | Document titled "██████████" and dated February 6, 2023 (ZYNGA_IBM_0131968) | n/a |
| **Exhibit 11** | Presentation titled "████████████" (ZYNGA_IBM_0139489) | n/a |
| **Exhibit 12** | Opening Expert Report of Christopher Thompson dated February 2, 2024 | Thompson Op. |
| **Exhibit 13** | Document titled ██████████ ██████████" (ZYNGA_IBM_0046106) | n/a |
| **Exhibit 14** | Document titled "██████" (ZYNGA_IBM_0082926) | n/a |
| **Exhibit 15** | Presentation titled "████████" and dated September 6, 2018 (ZYNGA_IBM_0099052) | n/a |
| **Exhibit 16** | Presentation titled "████████████" with a date created of September 10, 2021 (ZYNGA_IBM_0001743) | n/a |

## I.    INTRODUCTION

IBM's damages expert, Dominic Persechini, intends to tell the jury that Zynga would have agreed—in 2007, before it had released a single game—to pay over $ ███████ to IBM for a license to use the Asserted Patents.  He reaches this conclusion by violating Federal Circuit precedent in numerous ways, and his opinions are neither reliable nor admissible.

**First**, Mr. Persechini applies a profit-split analysis that is indistinguishable from the profit split analysis that the Federal Circuit rejected as insufficiently tied to the facts of the case in *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1331, 1334 (Fed. Cir. 2014).  He calculates this profit split based only on public, companywide Zynga expense data.  He did not consider any of the crucial "facts of the case" like the nature of accused products and the purported benefits of the patents.  **Second**, Mr. Persechini's application of the hypothetical negotiation framework is fundamentally flawed.  His analysis is indistinguishable from a running royalty, which he opines that the parties would not have agreed to, places the wrong parties at one of the hypothetical negotiating tables, and is, at bottom, an improper backwards-looking inquiry.  **Third**, Mr. Persechini has failed to apportion his royalties to the benefits of the Asserted Patents.  In many cases, he relies on documents that he contends measure these benefits when they, in fact, relate to admittedly unclaimed technology.  And he likewise *admitted* that his revenue base includes *non-infringing* revenue, despite the Federal Circuit's long-standing rule that "[t]he royalty base for reasonable royalty damages cannot include activities that do not constitute patent infringement." *Enplas Display Device Corp. v. Seoul Semiconductor Co.*, 909 F.3d 398, 411 (Fed. Cir. 2018) (citations omitted).  Zynga accordingly respectfully requests that the Court exclude his opinions.

## II.    FACTUAL BACKGROUND

IBM alleges that Zynga is infringing two expired patents:  U.S. Patent Nos. 7,072,849 (the "'849 patent") and 7,702,719 (the "'719 patent").  The '849 patent relates generally to methods for

presenting advertising in an interactive service.  IBM accuses offers for virtual items and third-party advertisements appearing in 67 Zynga games of infringing claims 1, 3, 8, 9, 12, 13, 21, and 22 of the '849 patent.  Ex. 1[1] (Persechini Op.), ¶¶ 36-37. Within the '849 patent, IBM asserts two sets of claims. The first (claims 1, 3, and 13) relates to concurrently displaying applications with advertisements that have been pre-fetched.  The second (claims 8, 9, 12, 21, and 22) relates to targeting advertisements.  Mr. Persechini's damages opinions for the '849 Patent focus on the value of the purported benefits of pre-caching and targeting advertisements.

The '719 patent relates generally to a method for configuring a server-based application.  IBM accuses just one game—Empires & Puzzles—of infringing claims 1, 2 and 12 of the '719 patent.  *Id.* ¶ 31.  Specifically, IBM alleges that a feature within Empires & Puzzles in which ███ ████████████████████████████████████████████████████████████████ ████████████████████  *Id.* ¶ 50.  Although the '719 does not mention or discuss cheating, Mr. Persechini's damages opinions for the '719 Patent turn on the value of purported benefits of cheat detection.  *Id.* ¶¶ 579-80.

### A.    Accused Functionality

#### 1.    Offers for Virtual Items

"Zynga's 'primary revenue source is through the sale of in-game virtual currency that players use to buy virtual goods or through the sale of virtual goods directly ….'"  Ex. 1, ¶ 86 (citation omitted).  As an example, Zynga offers virtual coins for sale in Words With Friends 2, *id.* ¶ 170, and virtual cars keys and parts for sale in CSR 2, *see id.* ¶ 500, Fig. 89.  ██████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

---

[1] All exhibits cited herein are attached to the Declaration of Sarah Mullins filed herewith.

████████████████████████████████████████████████████

███████████████████████████████████████████

### 2.     Third-Party Advertising

Zynga displays different types of third-party advertisements in its games, including interstitial ads (which typically occur between levels of a game) and rewarded ads (which give users the opportunity to view an advertisement to obtain an in-game reward).  *Id.* ¶¶ 41-46.  These advertisements can take the form of, among other things, static images, interactive mini-games, and videos. *Id.* ¶¶ 41-46, 64. ██████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

### 3.     Cheating Detection in Empires & Puzzles

Empires & Puzzles is a match-3 style game (Ex. 1, ¶ 48) originally released by Small Giant Games in March 2017.  *Id.* ¶ 179.  Zynga acquired Small Giant in January 2019.  *Id.* ¶ 184.

Empires & Puzzles uses several methods to prevent cheating.  ██████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████

### B.     Mr. Persechini's Damages Analyses

Mr. Persechini claims to have applied the "hypothetical negotiation" framework to determine a reasonable royalty.  *See* Ex. 1, ¶¶ 171-72.  For the '849 patent, Mr. Persechini opined

that the hypothetical negotiation between IBM and Zynga would have taken place on or before July 4, 2007 (when Zynga Poker was released). *Id.* ¶¶ 176, 183. For the '719 patent, Mr. Persechini opined that the hypothetical negotiation between IBM and Small Giant—who he contends would have been "negotiating on behalf of Zynga"—would have taken place on March 2, 2017 (the release date of Empires & Puzzles). *Id.* ¶¶ 179-85.

To determine what the parties would have agreed to at each hypothetical negotiation, Mr. Persechini identified various alleged benefits that IBM contends flow from Zynga's alleged use of the Asserted Patents. For claims 1, 3 and 13 of the '849 patent, Mr. Persechini identified just one benefit—the ability to "display virtual item advertisements within the game application." *See* Ex. 1, ¶ 506. For claims 8, 9, 12, 21, and 22 of the '849 patent, Mr. Persechini identifies three benefits: (1) the ability to "target[] advertisements for virtual items sales in its games," *id.* ¶ 342; (2) the ability to "target[] third-party advertising," *id.* ¶ 337; and (3) the ability to "pre-cach[e] third-party advertisements," *id.* ¶ 596. For the '719 patent, Mr. Persechini identified the benefit of "prevent[ing] cheating for Empires & Puzzles." *Id.* ¶ 580. Mr. Persechini relied on the opinions of another IBM expert, Dr. Scott Martin, to identify these benefits. Mr. Persechini then purported to calculate the incremental profits that Zynga earns for each benefit. *See id.* ¶¶ 469-470, 484-485, 497, 508, 514. He then split those profits between IBM and Zynga. *See id.* ¶¶ 623-635.

Mr. Persechini concludes that Zynga would agree to pay the following royalties for infringing the '849 and '719 patents: (1) ███████ for "pre-caching of third-party advertisements"; (2) ███████ for the "targeting of third-party advertisements"; (3) ███████ for the "targeting of advertising for in-app purchases"; (4) ███████ for the "concurrently displaying advertising for in-app purchases."; and (5) ███████ for "anti-cheat." *See* Ex. 1, § 2.1, ¶ 580. In total, he opined that Zynga would agree to pay IBM ███████ in

4

royalties.  *See id.*  Mr. Persechini later clarified that, for the '849 Patent, Zynga and IBM would have agreed in 2007 to a license in which Zynga would begin making quarterly royalty payments to IBM in 2016.  Ex. 3 (Persechini Tr.), 206:7-207:18.

## III.    LEGAL STANDARD

Under Fed. R. Evid. 702, expert testimony is permitted at trial only if: (1) it is based on "scientific, technical, or other specialized knowledge"; (2) the expert's specialized knowledge "will help the trier of fact to understand the evidence or to determine a fact in issue"; (3) it is "based on sufficient facts or data"; (4) it "is the product of reliable principles and methods"; and (5) the expert has reliably applied "the principles and methods to the facts of the case."  "The proponent of the expert testimony bears the burden of proving its admissibility by a preponderance of evidence."  *Intuitive Surgical, Inc. v. Auris Health, Inc.*, 549 F. Supp. 3d 362, 367 (D. Del. 2021)

For expert testimony regarding patent damages, "[t]he essential requirement for reliability under *Daubert* is that the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product . . .[;] [i]n short, apportionment."  *Commonwealth Sci. & Indus. Rsch. Organisation v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015) ("*CSIRO*").  Patentees must "apportion the royalty down to a reasonable estimate of the value of its claimed technology, or else establish that its patented technology drove demand for the entire product."  *VirnetX*, 767 F.3d at 1329.

## IV.    ARGUMENT

### A.    Mr. Persechini Fails To Tie His Profit Split To The Facts Of The Case.

Mr. Persechini's analysis must be excluded because his profit split methodology is not sufficiently tied to the facts of the case.  As noted above, Mr. Persechini's five separate damages calculations for the two Asserted Patents start by determining the incremental profits he asserts are attributable to IBM's inventions.  But because "patent infringement carries no remedy of an

accounting for an infringer's profits," *Water Techs. Corp. v. Calco, Ltd.*, 850 F.2d 660, 673 (Fed. Cir. 1988), Mr. Persechini divides those profits between Zynga and IBM in a proportion that he asserts matches the parties' relative contributions to those profits. Ex. 1, ¶¶ 624-29.  He claims to have done this split under the guise of *Georgia Pacific* factor 13: "the portion of profit *attributable to the invention*."  *Id.* ¶ 623.

Specifically, Mr. Persechini opined that IBM and Zynga would have negotiated to split the incremental profits such that Zynga would maintain 52.73% of the incremental profits purportedly attributable to the '849 patent, and 55.62% of the incremental profits purportedly attributable to the '719 patent, with the rest of the incremental profits going to IBM.  *Id.* ¶¶ 629-30.  He arrived at these percentages by calculating, from public documents, the ratio between "Zynga's sales and marketing ('S&M') expenditures relative to its expenditures on combined research and development ('R&D') and S&M" for the relevant damages period.  *Id.* ¶¶ 626, 629.

This profit split methodology is inadmissible because it is not sufficiently tied to the facts of the case.  Mr. Persechini's ratio is entirely unrelated to the patents, the claimed inventions, the relevant technologies, or even the specific accused games.  As such, it is akin to the "25 percent rule" or "Nash Bargaining Solution" that courts have repeatedly rejected as being "insufficiently tied to the facts of [a] case" to support a damages award.  *See VirnetX*, 767 F.3d at 1334.

*VirnetX* is directly on point.  In *VirnetX*, the plaintiff's damages expert offered several "estimates of the damages attributable to the FaceTime feature" in Apple's accused products.  *Id.* at 1331.  For one of those estimates, the expert first calculated the "incremental profits" associated with FaceTime and then "split those incremental profits" by "invoking the Nash Bargaining Solution."  *Id.*  Under the Nash Bargaining Solution, "each bargainer get[s] the same money profit," so the expert started with a 50/50 split of profits.  *Id.* at 1325 (citation omitted).  He then

made adjustments to that starting point because he opined that "VirnetX would have received only 45% of the profit because of its weaker bargaining position." *Id.*

The Federal Circuit rejected this analysis because the expert had done nothing to establish that the premises underlying the Nash Bargaining Solution applied to the case. *Id.* at 1333. The court analogized the proposed profit split to the "25 percent rule of thumb" royalty rate that it had previously rejected in *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011). The court noted that, like the 25 percent rule, the proposed use of the Nash Bargaining Solution to arrive at a profit split failed to "differentiate between different industries, technologies, or parties …. [and] made too crude a generalization about a vastly more complicated world." *Id.* at 1332; *see also Uniloc*, 632 F.3d at 1313 (criticizing the "25 percent rule" because it fails to account for "the unique relationship between the patent and the accused product" or "the unique relationship between the parties"). As a result, the *VirnetX* court concluded that "the suggestion that … profits be split on a 50/50 basis—even when adjusted to account for certain individual circumstances—is insufficiently tied to the facts of the case, and cannot be supported." 767 F.3d at 1334.

The connection between Mr. Persechini's profit split and the facts of this case is just as attenuated as the connections between the 50/50 split in *VirnetX* or the 25% rule in *Uniloc*. Mr. Persechini's profit split is based solely on a ratio between **company-wide** expenses that Zynga classifies as "sales and marketing" in its publicly available financial data and its combined **company-wide** "sales and marketing" and "research & development" expenses. Ex. 1, ¶ 626. The ratio is purely a function of (1) Zynga's accounting practices and (2) time. *See* Ex. 3 at 169:13-17; Ex. 1, ¶ 630 (discussing different applicable time frames). Under Mr. Persechini's methodology, the industry, inventions, accused products, and plaintiff involved in this case are wholly irrelevant. *See VirnetX*, 767 F.3d at 1332 (analysis that fails to "differentiate between

different industries, technologies, or parties" in damages analysis is insufficiently tied to the case). Provided that the damages periods were the same, Mr. Persechini's approach would reach the same profit split in a case filed against Zynga by a competitor asserting that all of Zynga's games infringe ten foundational patents and a case filed by a non-practicing entity asserting that Game of Thrones Slots infringes a single patent claiming a minor improvement related to the game's reel spinning animation. *See* Ex. 3 at 182:6-18 (the identity of the patent owner would not affect his profit split), 175:13-19 (the ratio uses company-wide expenses not specific to any particular product or feature).

To be clear, Mr. Persechini's unrelated profit split is not saved by the fact that he is splitting alleged *incremental* profits attributable to the Asserted Patents. That is precisely what the plaintiff's expert did in *VirnetX*, and the Federal Circuit nonetheless affirmed exclusion of his opinion because his *profit split* was not tied to the facts of the case, even when he was splitting "only … the incremental profits earned by the infringer from the use of the asserted patents." 767 F.3d at 1333. Mr. Persechini's opinions must similarly be excluded.

### B.    Mr. Persechini Fails to Apply The Hypothetical Negotiation Framework.

Although there are several approaches to determining a reasonable royalty, *see, e.g.*, *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009) (describing approaches), Mr. Persechini purports to apply a hypothetical negotiation framework in his analysis. *See* Ex. 1, ¶¶ 171-72. But his analysis ignores several of the key elements of such a negotiation—he selected a form of the royalty that he admits no party would have agreed to, put the wrong parties at one of the hypothetical negotiation tables, and applied an improper, backwards-looking inquiry. His analysis is thus unreliable and must be excluded under Rule 702.

### 1.    Mr. Persechini's Calculation Is Indistinguishable From A Running Royalty, Which He Contends Neither Party Would Have Agreed To.

Mr. Persechini's opinion is unreliable because made the fundamental error of presenting a

running royalty opinion, while simultaneously admitting that neither IBM nor Zynga would have agreed to such a royalty. *See* Ex. 3 at 39:12-40:3, 40:14-22. His selection of a running royalty is contrary to *his own analysis*, and his opinion is unreliable and must be excluded.

"Subsumed within [Factor 2 in the *Georgia-Pacific* analysis] is the question of whether the licensor and licensee would have agreed to a lump-sum payment or instead to a running royalty based on ongoing sales or usage." *Lucent*, 580 F.3d at 1326. There are "significant differences" between these two royalty options. *Id.* "In a standard running royalty license, the amount of money payable by the licensee to the patentee is tied directly to how often the licensed invention is later used or incorporated into products by the licensee." *Id.* This structure thus "shifts many licensing risks to the licensor" and places more control in the hands of licensees. *See id.* Lump-sum agreements, in contrast, "enable[] the [patentee] to raise a substantial amount of cash quickly and benefit[] the [licensee] by capping its liability and giving it the ability … to actually use the patented technology in its own products without any further expenditure." *Id.*

Mr. Persechini's royalty, although labeled as a "lump sum" agreement, is in fact a running royalty. Mr. Persechini believes that IBM and Zynga would have agreed in 2007, with inexplicable foresight, to a license for the '849 patent in which Zynga would make quarterly payments to IBM, eventually totaling ████████, based on Zynga's future use of the invention from 2016-2022. *See* Ex. 3 at 16:12-23, 205:10-15 ("The royalty payments would commence with Zynga's use of the technology and the economic benefits that it realized from the technology in the damages window."), 206:7-207:18. His analysis is the same for the '719 patent. *See id.* at 23:20-24:1.

Mr. Persechini's license structure has none of the benefits of a lump sum license for either party. IBM does not "raise a substantial amount of cash quickly" and Zynga does not "cap[] its liability" or avoid "further expenditure" because its damages are directly tied to its profits in Mr.

Persechini's model.  *See Lucent*, 580 F.3d at 1326.  Instead, the license payments are "tied directly to how often the licensed invention is later used or incorporated into products by the licensee," i.e., a running royalty.  *See id.*  In fact, Mr. Persechini has repeatedly referred to the "royalty rate(s)" and "base" he calculated when describing his analysis.  *See* Ex. 1 ¶ 640; Ex. 3 at 29:2-9, 160:20-161:7, 224:3-6.  He nonetheless opines that neither IBM nor Zynga would have agreed to a running royalty.  *See* Ex. 3 at 39:12-40:3, 40:14-22.  Because a damages award cannot be based on a form of royalty that is not supported by the record, Mr. Persechini's opinion must be excluded. *See Lucent*, 580 F.3d at 1326-27, 1333 (finding no substantial evidence supporting lump sum jury verdict where plaintiff's expert "argued for damages based solely on a running royalty rate").

### 2.    Mr. Persechini's Damages Analysis For The '719 Patent Puts The Wrong Parties At The Hypothetical Negotiating Table.

Mr. Persechini placed the wrong parties at the hypothetical negotiation table in his '719 patent analysis.  This renders his analysis unreliable and it must be excluded under Rule 702.

"[T]he hypothetical negotiation framework … seeks to discern the value of the patented technology to *the parties in the marketplace when infringement began*."  *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 76 (Fed. Cir. 2012) (emphasis added).  As a result, "the analysis must begin with the proper parties in mind."  *Opticurrent, LLC v. Power Integrations, Inc.*, 2018 WL 6727826, at *9 (N.D. Cal. Dec. 21, 2018).

Mr. Persechini acknowledges that Small Giant Games, a Finnish company, was the developer of Empires & Puzzles on the March 2017 hypothetical negotiation date. Ex. 1, ¶¶ 181, 184.  He also acknowledges that Zynga did not acquire Small Giant until nearly two years later. *Id*. ¶ 184.  He nonetheless opines that, at the hypothetical negotiation, Small Giant would have been negotiating "on behalf of Zynga."  *Id.* ¶ 185.  Although he has asserted it is a "common practice" to have a party negotiate on behalf of someone else at the hypothetical negotiation, he

was unable to identify any source, other than his "experience in this industry" to support that practice.  Ex. 3 at 20:4-16.  Nor does his report explain why either Small Giant or IBM would have thought, in 2017, that Zynga, a then totally unrelated company, should be involved.

Mr. Persechini's erroneous suggestion that Small Giant would negotiate for a hypothetical licensed to the '719 patent "on behalf of Zynga" fails to isolate the value of the '719 patent to the actual "parties in the marketplace when infringement began." *See LaserDynamics*, 694 F.3d at 76. Mr. Persechini has admitted that Zynga and Small Giant were not identically situated.  Specifically, he acknowledged that, if Small Giant was negotiating on behalf of itself, his analysis would change because he would "look at the profitability and things of that nature for Small Giant."  Ex. 3 at 23:2-19.  That alone proves his opinion is unreliable.  Worse, he has provided no explanation for the facially ridiculous proposition that Small Giant and IBM would have agreed to a profit split based on the company-wide financial figures of *Zynga*, a wholly irrelevant third party.  Several courts have excluded damages opinions where the expert placed the wrong parties at the hypothetical negotiation and where there were differences in the bargaining positions of the correct party and the party the expert identified.  *See, e.g.*, *Daedalus Blue LLC v. SZ DJI Tech. Co.*, 2022 WL 831619, at *8 (W.D. Tex. Feb. 24, 2022) (finding exclusion was appropriate where expert put wrong parties at negotiating table and acknowledged "that IBM's bargaining position is not the same as Daedalus Blue's for several reasons" (quotation marks omitted)); *Opticurrent*, 2018 WL 6727826, at *9 (similar).  This Court should follow suit and exclude Mr. Persechini's damages opinions for the '719 patent.

### 3.     Mr. Persechini Conducted A Backward-Looking Inquiry, Not A Hypothetical, Forward-Looking Exercise.

Mr. Persechini also made no effort to conduct a hypothetical, ex ante exercise to determine a reasonable royalty on the date of first infringement.   "When [the hypothetical negotiation]

11

framework is employed, the negotiation must be hypothesized *as of the time infringement began*." *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1384 (Fed. Cir. 2001) (emphasis added).  Damages are "to be determined not on the basis of a hindsight evaluation of what actually happened, but on the basis of what the parties to the hypothetical license negotiations would have considered *at the time of the negotiations*."  *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1081 (Fed. Cir. 1983) (emphasis added); *see also Lucent Techs.*, 580 F.3d at 1325 ("The hypothetical negotiation tries, as best as possible, to recreate the ex-ante licensing negotiation scenario and to describe the resulting agreement.").  Put simply, "expectations govern" at the hypothetical negotiation, not "actual results."  *Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766, 772 (Fed. Cir. 2014).

Although the "Book of Wisdom" allows "factual developments occurring after the date of the hypothetical negotiation [to] inform the damages calculation," the Federal Circuit considers post-negotiation developments relevant because they "may provide information that the parties would frequently have estimated during the negotiation." *Lucent*, 580 F.3d at 1333.  This suggests that "future events [considered pursuant to the Book of Wisdom] must have been predictable as opposed to conceivable or imaginable." *Probatter Sports, LLC v. Sports Tutor, Inc.*, 586 F. Supp. 3d 80, 91–92 (D. Conn. 2022), *aff'd*, 2023 WL 7548208 (Fed. Cir. Nov. 14, 2023); *see also AccuScan, Inc. v. Xerox Corp.*, 1998 WL 603217, at *7 (S.D.N.Y. Sept. 11, 1998) ("While future events may therefore be considered, the analysis must, at the very least, be anchored with facts that existed at the time of infringement."), *aff'd in part, rev'd in part on other grounds*, 76 F. App'x 290 (Fed. Cir. 2003).  The purpose of the Book of Wisdom is thus "not to charge the offender with elements of value non-existent at the time of his offense.  It is to bring out and expose to light the elements of value that were there from the beginning." *Fromson v. W. Litho Plate & Supply Co.*,

853 F.2d 1568, 1575 (Fed. Cir. 1988), *overruled on other grounds by Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337 (Fed. Cir. 2004).

By contrast, Mr. Persechini's analysis extends far beyond any permissible use of the Book of Wisdom and is indistinguishable from an improper "hindsight evaluation of what actually happened." *See Hanson*, 718 F.2d at 1081.  For the '849 patent, the hypothetical negotiation would have taken place in 2007—when the iPhone had just been been released, ██████████████ ████████████████████████████ did not exist, and Zynga was a startup company about to launch its first game.  Ex. 1, ¶ 16.  Mr. Persechini's calculation of incremental benefits uses Zynga analyses that (1) post-date the hypothetical negotiation—by over a decade in most cases, and (2) relate to games and features that did not exist at the time.  *See, e.g.*, *id.* ¶¶ 486 (relying on ████████████████████, 444-454 (relying on the ████████████████████ █), 510-512 (relying on ████████████████████; Ex. 3 at 31:23-32:3 (relying on ██████████████████).  He also relies on the post-negotiation-date creation of the Google and Apple app stores and their subsequent decisions regarding the fees they charge to app developers for purchases conducted through their platforms.  Ex. 1, ¶ 505.  Mr. Persechini's provides no explanation as to how either party would have negotiated in view of these "elements of value non-existent at the time" of first infringement.  *Fromson*, 853 F.2d at 1575.

### C.    Mr. Persechini's Analysis Fails To Apportion Between Allegedly Infringing And Non-Infringing Game Features And Revenue.

The Court should also exclude Mr. Persechini's opinions because he offers unapportioned damages estimates that fail to "reflect the value attributable to the infringing features of the [accused Zynga games], and no more." *MLC Intell. Prop., LLC v. Micron Tech., Inc.*, 10 F.4th 1358, 1373 (Fed. Cir. 2021) (citation omitted).

In a damages model that seeks to isolate the value of a patented invention, "where the data

used is not sufficiently tied to the facts of the case, … [the] model cannot meet the substantive statutory requirement of apportionment of royalty damages to the invention's value." *CSIRO*, 809 F.3d at 1302 (cleaned up). It is well-settled that "a reasonable royalty cannot include activities that do not constitute patent infringement, as patent damages are limited to those adequate to compensate for the infringement." *Enplas*, 909 F.3d at 411 (citation and quotation marks omitted). For this reason, the Federal Circuit has repeatedly rejected damages calculations that were based in part on the sale of non-infringing products or on non-infringing activities. *See id.* at 412 ("[O]ur precedent proscribe[s] awarding damages for non-infringing activity."); *Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1357 (Fed. Cir. 2022) (affirming exclusion of expert testimony because the expert's "failure to account for noninfringing uses of the sold devices [in calculating damages for the infringement of method claims] was legally improper").

Mr. Persechini's damages analysis regarding the benefits of (1) pre-caching third-party ads; (2) targeting third-party ads; (3) targeting offers for virtual items; and (4) cheating detection fail to apportion out non-infringing features of the accused games and, in some instances, are based on non-infringing revenue, as described below.

### 1. Mr. Persechini's Damages For Pre-Caching Third-Party Ads Is Based On Unpatented Features And Non-Infringing Ads.

To calculate the incremental profits associated with "pre-caching" third-party ads, Mr. Persechini determined what he asserts is the "weighted average" percent decrease in ad impressions per user that Zynga would experience if it were unable to pre-cache ads. Ex. 1, ¶¶ 451-53. He then applied that rate to Zynga's U.S. third-party advertising revenue (*see id.* ¶¶ 426-33, Fig. 94) and converted that incremental revenue to incremental profit. *See id.* ¶¶ 469-70. There are two apportionment problems with this analysis.

**First**, the rate that Mr. Persechini used to calculate incremental profits is not tied to the

facts of the case.  He based the rate on ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████

██████████████████████████  did  nothing  to  measure  any  of  the  purported  benefits  of

"prefetching" advertisements as claimed in the '849 patent.  Put simply, Mr. Persechini sought to

measure the benefit Zynga would realize if users did not have to wait for an advertisement to

*download* (because the advertisement had been prefetched), but he instead considered the benefit

of users not having to wait ████████████████████████████████████████

████  Mr. Persechini has no basis to credit benefits associated with decreasing the ████████████

to IBM's claimed invention.  Claims 8, 9, 12, and 21 of the '849 patent do not recite ***any*** steps

relating to shortening the time needed to identify a source for a particular ad.  Instead, the claims

recite "structuring advertising," which covers how the ad is formatted (i.e., "structure[ed]"), supplied (i.e., "selectively … in accordance with the characterizations"), and stored at a user's device (i.e., "storing a predetermined amount of the advertising data"). *See* '849 patent, claims 8, 21. IBM's infringement expert, Mr. Thompson, ████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████ He also admitted that claim 8 does not recite any improvements related to the

████████████████████████████████████████████████████████████████████████

████████████████████████████████████ Because Mr. Persechini does "not have an adequate basis for treating the results of the … study as sufficiently tied to the invention," his opinion should be excluded. *See Sound View Innovations, LLC v. Hulu, LLC*, 33 F.4th 1326, 1338 (Fed. Cir. 2022) (affirming exclusion of damages opinion that did not evaluate the "conceptually central issue" of how much of the measured improvement was attributable to the asserted claim).

**Second**, Mr. Persechini applied his calculated rate to Zynga's third-party advertising revenue for *all* interstitial and rewarded video ads—including revenue generated by admittedly non-accused ads. *See* Ex. 1, ¶¶ 462-63. Specifically, IBM admitted that "████████ advertising"[2] is not accused of infringement. *See* Ex. 2, ¶ 141 ("I understand from Mr. Thompson that Zynga's use of ████████ advertising is not accused of infringing the '849 patent."). "The royalty base for reasonable royalty damages cannot include activities that do not constitute patent infringement." *Enplas*, 909 F.3d at 411 (citations omitted). Yet Mr. Persechini *admits* that there is ████████████ ████████ in Zynga's accused games, but he has not attempted to remove revenue associated with that advertising from his royalty base. Ex. 3 at 85:21-86:10. And while he makes no mention

---

[2] ████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

of this overinclusion in his reports, he claimed for the first time at his deposition that he nonetheless accounted for this inclusion of non-infringing revenue by adopting a royalty rate that "underestimates the benefits Zynga gets from pre-fetching third-party ads." *Id.* at 87:9-18.  In other words, Mr. Persechini has admitted to attempting to "balance out an unreasonably high royalty base simply by asserting a low enough royalty rate," precisely as the Federal Circuit forbids. *VirnetX*, 767 F.3d at 1333.  Even if that practice were proper, Mr. Persechini has not even tried to estimate the number of ███████ ads or the revenue associated with those ads, so he has no basis to say that his alleged "underestimat[ion]" accounts for those ads.  Because Mr. Persechini based his damages on revenue associated with activities that IBM admits do not infringe, his opinion must be excluded.  *See Niazi*, 30 F.4th at 1357 (affirming exclusion of expert testimony where expert's calculation included non-infringing revenue).

### 2. Mr. Persechini's Damages Calculation For Targeting Third-Party Ads Is Based On The Value Of Unpatented Targeting Techniques And Includes Revenue For Non-Infringing Ads.

Mr. Persechini failed to properly apportion his royalties attributable to the purported benefits of targeted advertising.  To calculate the incremental profits associated with targeting third-party ads, Mr. Persechini calculated "scaled revenue loss" percentages that each game would suffer if it were unable to target third-party ads.  Ex. 1, ¶ 471.  He then applied those rates to Zynga's U.S. third-party advertising revenue for interstitial and rewarded video ads.  *See id*. ¶¶ 426-33, Fig. 95.  There are two apportionment problems with his targeting analysis.

**First**, the rate that Mr. Persechini used to calculate incremental profits is, again, not tied to the facts of the case.  He derived these percentages from testimony from Michael Ballard, a Lead Product Manager at Zynga.  *Id.* ¶ 471; Ex. 6 at 11:22-24.  Mr. Persechini characterizes Mr. Ballard's testimony as follows: ████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

The problem with Mr. Persechini's analysis is that claims 8 and 21 do not relate to ad targeting using any particular piece of data, ████████████  Instead, they recite the basic concepts of "compiling data," "establishing characterizations" based on that data, and supplying ads "in accordance with the characterizations." '849 patent, claims 8, 21.  The claims are agnostic to ██████████████████████████████████████████████████ ████████████████████████  Measuring the value of unclaimed features based on the efforts of these third parties ████████████████████████████████ "is not sufficiently tied to the facts of the case."  *See CSIRO*, 809 F.3d at 1302.

**Second**, as he did with his calculation of the benefits of pre-caching for third-party ads, Mr. Persechini applied the rate he calculated to all of Zynga's third-party interstitial and rewarded video advertising revenue, including revenue that IBM admits is associated with non-infringing activities (████████ advertising).  This is improper.  *See supra* § IV(C)(1).

>    **3.    Mr. Persechini's Damages Calculation For Targeting Offers For Virtual Items Is Based On The Value Of Zynga's Targeting Techniques And Includes Revenue For Non-Infringing Offers.**

Mr. Persechini did not apportion his royalties relating to the purported benefits of targeting in connection with Zynga's in-game offers for virtual items.  To calculate the incremental profits associated with targeting offers for virtual items, Mr. Persechini calculated the percent revenue reduction that he estimated Zynga would experience if it lost "the ability to ████████████ ████████████████████████████████████████████████  Ex. 1, ¶ 493,

Fig. 87. He then applied that rate to Zynga's U.S. revenue for virtual item sales, less revenue from Zynga's webstore. *See id.* ¶ 495. As with his previous analyses, Mr. Persechini failed to apportion between patented and unpatented features and included non-infringing revenue in his analysis.

**First**, Mr. Persechini's "revenue reduction" rate is entirely based on Zynga's business strategies and is wholly unconnected to the patented technology. To calculate the rate, Mr. Persechini considered data from ███████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████ ███████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████ █ ████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████████

────────────────────────────

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████    Claims 8 and 21 of the '849 Patent do not teach a specific technique for deciding what criteria to use to target ads or what to include in those ads.  *See* '849 patent, claims 8, 21.  Far from measuring "the incremental value that the patented invention adds to the end product," Mr. Persechini has solely measured the incremental value associated with Zynga's know-how and business acumen.  *See Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014).

In fact, Mr. Persechini has all but admitted that he is not valuing the technological footprint of the invention.  Relying on Dr. Martin, Mr. Persechini states that his understanding is that Zynga "would obtain similar revenue benefits from targeting advertising ***using any technical method***" because "to the extent Zynga uses another internal mechanism to deliver targeted virtual item advertisements, the impact on the end user is the same."  Ex. 1, ¶ 343 (emphasis added); *see also* Ex. 2, ¶ 122 (acknowledging he did not value the benefit of targeting versus not (the claimed invention), but rather assessed the benefits of Zynga's specific (unclaimed) techniques).  Because his analysis is not sufficiently tied to the patents, it must be excluded.

**Second**, Mr. Persechini lacks the technological qualifications to draw the conclusions he drew from ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████████████████████ Mr. Persechini's error is no different than the error that led to an expert's analysis being excluded in *Good Technology Corp. v. MobileIron, Inc.*, 2015 WL 4090431, at *7 (N.D. Cal. July 5, 2015), where the expert "count[ed] up the ten Gartner inclusion criteria" and "assign[ed] equal value to each" and but did "no investigation into whether any of the criteria is more important than others, or how strongly each … is tied to the patents." Mr. Persechini's opinion likewise lacks such analysis, so his opinions regarding ████████████████████████████████████

**Third**, Mr. Persechini has, again, included unaccused revenue in his analysis. Mr. Thompson's analysis of the various degrees of targeting in the accused games makes clear that not all offers in the accused games are targeted. *See, e.g.*, Ex. 12 (Thompson Op.), ¶¶ 187 (describing the "Medium" targeting tier as games that ██████████████████████████████ (emphasis added)), 188 (describing the "Minimal" tier as games that █████████████████ ████████████████████████████████████████████████████████ ██████████████████). Because Mr. Persechini included revenue associated with non-infringing sales, his opinion must be excluded for all the reasons described in section IV(C)(1).

### 4.    Mr. Persechini's Damages For The '719 Patent Fails To Apportion Between Accused And Unaccused Methods Of Cheating Detection.

To calculate damages for the '719 patent, Mr. Persechini purports to estimate the revenue impact in Empires & Puzzles due to cheating based on analysis conducted for another Zynga game. Because Empires & Puzzles uses multiple methods to detect cheating, and IBM accuses just one, this analysis fails to apportion between patented and unpatented features in the accused product.

Mr. Persechini's revenue loss determination is based on a presentation created by ██████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████



Mr. Persechini has done nothing to apportion that number to isolate the value of the *specific cheat detection method* allegedly practicing the '719 patent. This is crucial because Mr. Persechini acknowledges that Empires & Puzzles uses several different methods to detect cheating, that he is "not sure whether [the accused form of cheating detection] eliminates all cheating," and that he did not do any analysis to determine how much cheating is prevented by the accused cheating detection feature versus other implemented cheat detection techniques. *See* Ex. 3 at 130:15-23, 131:18-23, 135:20-138:8. Moreover, IBM's own expert agrees that Mr. Persechini's use of ████████ is little more than "speculation." Ex. 5 (Martin Tr.) at 188:13-19 (

).

Because Mr. Persechini does not have "have an adequate basis for treating the results of the ████████████████████ as sufficiently tied to the invention as claimed," his opinion is unreliable and should be excluded. *See Sound View*, 33 F.4th at 1338.

## V.    CONCLUSION

For the foregoing reasons, Mr. Persechini's damages testimony should be excluded and associated opinions struck from his reports, as described in Zynga's accompanying Motion.

Dated:  April 5, 2024

Respectfully submitted,

FARNAN LLP

*/s/ Brian E. Farnan*
Brian E. Farnan (Bar. No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 777-0300
(302) 777-0301 (Fax)
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

Alyssa Caridis (admitted *pro hac vice*)
Geoffrey Moss (admitted *pro hac vice*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
355 S. Grand Avenue, Suite 2700
Los Angeles, CA 90071
(213) 629-2020
acaridis@orrick.com
gmoss@orrick.com
jake.oneal@orrick.com

Clement S. Roberts (admitted *pro hac vice*)
Will Melehani (admitted pro hac vice)
Sarah K. Mullins (admitted pro hac vice
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
(415) 773-5700
croberts@orrick.com
wmelehani@orrick.com
sarahmullins@orrick.com

Evan D. Brewer (admitted *pro hac vice*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025
(650) 614-7343
ebrewer@orrick.com

Richard F. Martinelli (admitted *pro hac vice*)
Brooks Kenyon (admitted pro hac vice)
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
(212) 506-5000
rmartinelli@orrick.com

bkenyon@orrick.com

*Attorneys for Defendant Zynga Inc.*