## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

INTERNATIONAL BUSINESS MACHINES CORPORATION,

        Plaintiff,

    v.

ZYNGA INC.,

        Defendant.

C.A. No. 22-590-GBW

## DEFENDANT ZYNGA'S OPENING BRIEF IN SUPPORT OF ITS MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND A FINDING OF INVALIDITY FOR OBVIOUSNESS-TYPE DOUBLE PATENTING

Dated: October 22, 2024

Clement S. Roberts (admitted *pro hac vice*)
Elizabeth R. Moulton (admitted *pro hac vice*)
Will Melehani (admitted *pro hac vice*)
Sarah Mullins (admitted *pro hac vice*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
(415) 773-5700
croberts@orrick.com
emoulton@orrick.com
wmelehani@orrick.com
sarahmullins@orrick.com

Alyssa Caridis (admitted *pro hac vice*)
Geoffrey Moss (admitted *pro hac vice*)
Isaac Behnawa (admitted *pro hac vice*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
355 S. Grand Avenue, Suite 2700
Los Angeles, CA 90071
(213) 629-2020

Brian E. Farnan (Bar. No. 4089)
Michael J. Farnan (Bar No. 5165)
FARNAN LLP
919 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 777-0300
(302) 777-0301 (Fax)
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

Brooks J. Kenyon (admitted *pro hac vice*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
300 West 6th Street Suite 1850
Austin, TX 78701
(512) 582-6950
bkenyon@orrick.com

Evan D. Brewer (admitted *pro hac vice*)
Orrick, Herrington & Sutcliffe LLP
401 Union St, Ste 3300
Seattle, WA 98101
(206) 839-4300
ebrewer@orrick.com

Richard F. Martinelli (admitted *pro hac*

**Pages**

acaridis@orrick.com
gmoss@orrick.com
ibehnawa@orrick.com

*vice*)
Joseph R. Kolker (admitted *pro hac vice*)
Orrick, Herrington & Sutcliffe LLP
51 W 52nd St
New York, NY 10019
(212) 506-5000
rmartinelli@orrick.com
jkolker@orrick.com

***Attorneys for Defendant Zynga Inc.***

## <u>TABLE OF CONTENTS</u>

**Page(s)**

I.     ZYNGA IS ENTITLED TO JMOL OR NEW TRIAL ON THE '849 PATENT .............1

    A.     IBM Failed to Prove Infringement of the '849 Patent. ...........................................1

        1.     Both Claims 8 and 13 of the '849 Patent. ...................................................1

        2.     Claim 8 of the '849 Patent. ........................................................................7

        3.     Claim 13 of the '849 Patent. .....................................................................10

    B.     The Court Should Grant JMOL Or A New Trial On Invalidity of the '849 Patent.................................................................................................................13

        1.     A Properly Instructed Jury Could Only Find That Claims 8 and 13 of the '849 Patent Are Invalid Due To The On-Sale Bar. ........................13

        2.     Claim 13 Is Not Patentably Distinct From The Claims Of The '209 Patent........................................................................................................16

    C.     IBM Did Not Provide Substantial Evidence Of Willfulness. ...............................17

    D.     IBM's Improper Reliance On A Prior Verdict and Non-Comparable Licenses To Prove Infringement, Validity, and Damages Requires a New Trial.......................................................................................................................20

    E.     The Court's Limitations on Use of the Specification Requires a New Trial. ........24

II.    ZYNGA IS ENTITLED TO JMOL ON THE '719 PATENT...........................................25

III.   THE COURT SHOULD GRANT JMOL OR NEW TRIAL ON DAMAGES.................26

IV.    THE EARLIER-ISSUED, EARLIER-EXPIRING '209 PATENT IS A PROPER OBVIOUSNESS-TYPE DOUBLE PATENTING REFERENCE. ...................................29

V.     CONCLUSION..................................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allergan USA, Inc. v. MSN Lab'ys Priv. Ltd.*,
   111 F.4th 1358 (Fed. Cir. 2024) ...................................................................29, 30

*Aqua Shield v. Inter Pool Cover Team*,
   774 F.3d 766 (Fed. Cir. 2014) ...............................................................................27

*BASF Plant Sci., LP v. Commonwealth Sci. & Indus. Rsch. Org.*,
   28 F.4th 1247 (Fed. Cir. 2022) ..............................................................................17

*Bayer Healthcare LLC v. Baxalta Inc.*,
   989 F.3d 964 (Fed. Cir. 2021) ...............................................................................17

*Becker v. ARCO Chem. Co.*,
   207 F.3d 176 (3d Cir. 2000) ...................................................................................24

*In re: Cellect, LLC*,
   81 F.4th 1216 (Fed. Cir. 2023) ..............................................................................29

*CommScope Techs. LLC v. Dali Wireless Inc.*,
   10 F.4th 1289 (Fed. Cir. 2021) ..........................................................................8, 10

*CR Bard Inc. v. AngioDynamics, Inc.*,
   675 F. Supp. 3d 462 (D. Del. 2023) .......................................................................18

*Geneva Pharms., Inc. v. GlaxoSmithKline PLC*,
   349 F.3d 1373 (Fed. Cir. 2003) ..............................................................................25

*Harvey v. Plains Twp. Police Dep't*,
   635 F.3d 606 (3d Cir. 2011) ...................................................................................15

*Helsinn Healthcare S.A. v. Teva Pharms. USA, Inc.*,
   855 F.3d 1356 (Fed. Cir. 2017) ..............................................................................14

*ICU Med., Inc. v. RyMed Techs., Inc.*,
   752 F. Supp. 2d 486 (D. Del. 2010) .......................................................................21

*Implicit Networks Inc. v. F5 Networks Inc.*,
   No. 10-4234 SI, 2013 WL 1007250 (N.D. Cal. Mar. 13, 2013) ...............................3

*Intell. Sci. & Tech., Inc. v. Sony Elecs., Inc.*,
   589 F.3d 1179 (Fed. Cir. 2009) ................................................................... *passim*

*Johns Hopkins Univ. v. Datascope Corp.*,
    543 F.3d 1342 (Fed. Cir. 2008).................................................................5

*Lucent Techs., Inc. v. Gateway, Inc.*,
    580 F.3d 1301 (Fed. Cir. 2009).......................................................26, 28

*Masimo Corp. v. Philips Elec. N. Am. Corp.*,
    No. CV 09-80-LPS, 2015 WL 2379485 (D. Del. May 18, 2015)...........24

*Mirror Worlds, LLC v. Apple Inc.*,
    692 F.3d 1351 (Fed. Cir. 2012).................................................................3

*Niazi Licensing Corp. v. St. Jude Med. S.C.*,
    30 F.4th 1339 (Fed. Cir. 2022) ..............................................................26

*Novartis Pharms. Corp. v. Breckenridge Pharm. Inc.*,
    909 F.3d 1355 (Fed. Cir. 2018).......................................................29, 30

*Omega Pats., LLC v. CalAmp Corp.*,
    920 F.3d 1337 (Fed. Cir. 2019)..............................................................28

*Paradox Sec. Sys., Ltd. v. ADT Sec. Servs., Inc.*,
    388 F. App'x 976, 981-82 (Fed. Cir. 2010) ...............................3, 4, 6, 7

*ParkerVision, Inc. v. Qualcomm Inc.*,
    627 F. App'x 921, 924 (Fed. Cir. 2015) ..................................................5

*Pfaff v. Wells Elecs., Inc.*,
    525 U.S. 55 (1998)...................................................................................15

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)..............................................................24

*Plumtree Software, Inc. v. Datamize, LLC*,
    473 F.3d 1152 (Fed. Cir. 2006).......................................................15, 16

*RCA Corp. v. Data Gen. Corp.*,
    887 F.2d 1056 (Fed. Cir. 1989)..............................................................14

*Reeves v. Sanderson Plumbing Prods., Inc.*,
    530 U.S. 133 (2000).................................................................................3

*Roche Diagnostics Corp. v. Meso Scale Diagnostics*,
    LLC, 30 F.4th 1109 (Fed. Cir. 2022)......................................................18

*SRI Int'l, Inc. v. Cisco Sys.*,
    14 F.4th 1323 (Fed. Cir. 2021) ...............................................................17

*SRI Int'l, Inc. v. Cisco Sys., Inc.*,
    930 F.3d 1295 (Fed. Cir. 2019) ................................................................... 19

*Tex. Advanced Optoelectronic Sols., Inc. v. Renesas Elecs. Am., Inc.*,
    895 F.3d 1304 (Fed. Cir. 2018) ................................................................... 12

*Unwired Planet, LLC v. Apple Inc.*,
    829 F.3d 1353 (Fed. Cir. 2016) .......................................................... 19, 20

**Statutes**

35 U.S.C. § 101 ................................................................................................. 29

## TABLE OF DEFINITIONS

| Term | Description |
|---|---|
| The '849 patent | U.S. Patent No. 7,072,849 |
| The '719 patent | U.S. Patent No. 7,702,719 |
| The '209 patent | U.S. Patent No. 7,047,209 |
| Dr. Almeroth | Zynga's Infringement and Invalidity Expert for the '849 Patent, Dr. Kevin Almeroth |
| Dr. Bennett | Zynga's Infringement and Invalidity Expert for the '719 Patent, Dr. John Bennett |
| Dr. Kidder | Zynga's Damages Expert, Dr. Douglas Kidder |
| Mr. Thompson | IBM's Infringement Expert, Mr. Chris Thompson |
| Dr. Jeffay | IBM's Invalidity Expert, Dr. Kevin Jeffay |
| Dr. Martin | IBM's Technical Benefits Expert, Dr. Scott Martin |
| Mr. Persechini | IBM's Damages Expert, Mr. Dominc Persechini |
| XWF | Crosswords With Friends |
| CSR2 | CSR Racing 2 |
| E&P | Empires & Puzzles |
| FVCE | Farmville 2: Country Escape |
| FVTE | Farmville 2: Tropic Escape |
| HP | Harry Potter: Puzzles & Spells |
| HIR | Hit it Rich! |
| WOZ Slots | Wizard of Oz Slots |
| Zynga's Games | Crosswords With Friends ("XWF"), CSR Racing 2 ("CSR2"), Empires & Puzzles ("E&P"), Farmville 2, Farmville 2: Country Escape ("FVCE"), Farmville 2: Tropic Escape ("FVTE"), Farmville 3, Harry Potter: Puzzles & Spells ("HP"), Hit it Rich! ("HIR"), and Wizard of Oz Slots ("WOZ Slots") |

\*Unless otherwise noted:
- all citations to "Tr." are to the final trial transcript;
- all citations to "JTX," "PTX," and "DTX" are to the exhibits admitted at trial;
- all citations to "Ex." or "Exs." are to the exhibits attached to the Declaration of Brooks J. Kenyon; and
- all emphases, including to quotes, are added.

Zynga moves for renewed judgment as a matter of law and for a new trial following the jury's verdict. D.I. 529. Zynga also moves for a finding that claims 8 and 13 of the '849 patent are invalid for obviousness-type double patenting in view of the '209 patent.

## I. ZYNGA IS ENTITLED TO JMOL OR NEW TRIAL ON THE '849 PATENT

### A. IBM Failed to Prove Infringement of the '849 Patent.

At trial, IBM accused 33 games of infringing the '849 patent. The jury found that 10 games infringe claims 8 and 13 ("Zynga's Games"). In presenting its case, IBM relied on shortcuts and failed to provide specific evidence to justify the verdict as to most of those 10 games. The evidence IBM *did* provide was also inconsistent with the claim language and the Court's constructions. For these reasons, as explained in more detail below with respect to claim language in (1) both claims 8 and 13, (2) claim 8, and (3) claim 13, the jury's infringement verdict lacks substantial evidence.

#### 1. Both Claims 8 and 13 of the '849 Patent.

##### a. *IBM Did Not Provide Substantial Evidence for 8 of 10 Accused Games.*

IBM's approach to proving infringement relied on a generalized presentation of so-called exemplary and representative evidence, supported only by the conclusory assertions of its expert, Mr. Thompson. Rather than providing a limitation-by-limitation analysis for each of the 33 accused games, Mr. Thompson relied primarily on an analysis of only one game (E&P), with citations to evidence concerning other games peppered in, along with conclusory testimony that the rest of the accused games work "in the same way." *See, e.g.*, Tr. 393:6-9, 404:3-5, 408:16-409:1, 413:19-414:2, 427:11-21, 442:15-23. Aside from this evidence, IBM provided deposition testimony from Zynga's engineers regarding isolated functionality in *some* of the games. For example, IBM did not provide any analysis or explanation as to how 8 games (XWF, Farmville 2, FVCE, FVTE, Farmville 3, HP, HIR, and WOZ Slots) met these limitations:

| Claim Limitations | Games With No Specific Evidence |
|---|---|
| "establishing characterizations for respective users based on the compiled data" (claim 8) | Farmville 2, FVCE, FVTE, Farmville 3, and HP |
| "structuring applications so that they may be presented at a first portion of one or more screens of display" (claim 13) | XWF, Farmville 2, FVCE, FVTE, Farmville 3, HIR, WOZ Slots |

IBM's **only** specific basis to suggest that these games practice the claims is Mr. Thompson's conclusory statement that Zynga's Games perform these claim limitations based on his "review of the evidence," such as "source code," unidentified "engineer testimony," "confidential documents" that were not admitted into evidence or explained, and his "testing and interaction" with the games. *See, e.g.*, Tr. 408:16-409:1, 413:19-414:2, 439:14-25, 442:15-23. But Mr. Thompson provided no evidence or analysis demonstrating that the accused games work the same way for the relevant purposes. Instead, he merely declared it to be so, and then submitted hundreds of source code and other exhibits into evidence without discussion or analysis. *See, e.g.*, Tr. 368:14-370:16.

These bulk-admitted source code files and Mr. Thompson's conclusory assertion are insufficient to justify the verdict. The Federal Circuit consistently has held that a party cannot prove infringement "by simply framing the expert's conclusion as an assertion" that the accused product meets a claim limitation. *Intell. Sci. & Tech., Inc. v. Sony Elecs., Inc.*, 589 F.3d 1179, 1184 (Fed. Cir. 2009). Instead, "the record must specifically identify the infringing features … and the reason that one of skill in the art would recognize them as infringing. Without that further identification and explanation, a reasonable juror would not be able to determine that those allegedly infringing [features] are actually present." *Id.* at 1185. For example, in *Intell. Sci. & Tech.*, plaintiff's expert stated that the accused devices comprised the structural elements of a claimed "data transmitting means" and cited schematics for support. But the Federal Circuit found that the expert's conclusory statements did "not pinpoint where those elements [were] found in the accused devices" and the schematics were nothing more than "an unexplained array of electronic

2

symbols." *Id.* at 1184.[1] Similarly, in *Paradox Sec. Sys., Ltd. v. ADT Sec. Servs., Inc.*, plaintiff's expert opined that certain claim limitations were found in the accused product and cited documents from the defendant. 388 F. App'x 976, 981-82 (Fed. Cir. 2010). The Federal Circuit nonetheless found that the expert's "statements were entirely conclusory," noting that "he pointed to no structure in ... any of the [] schematics of [the] accused circuitry that were admitted into evidence" to show a "'DC bias source coupled to the transmit opto coupler input' as construed by the court." *Id.*; *see also Mirror Worlds, LLC v. Apple Inc.*, 692 F.3d 1351, 1358 (Fed. Cir. 2012) (expert's "conclusory statement" was "insufficient to allow a reasonable juror to find" infringement when the expert did "not explain why" the accused product met the claims).

The same reasoning applies here. Mr. Thompson's mere assertion that Zynga's Games infringe based on his "review of the evidence" or because they purportedly work in the same way as, e.g., E&P fails to "point[] to" anywhere in the bulk-admitted source code files—that he neither discussed nor showed the jury—or otherwise provides any explanation as how *these 8 particular accused games* satisfy every claim limitation. Mr. Thompson cannot simply point to isolated documents and bulk-admitted, unexplained source code and then declare that the evidence shows that dozens of other products infringe the claims. *Intell. Sci. & Tech.*, 589 F.3d at 1183-84; *Paradox,* 388 F. App'x at 981-82. Rather, to provide substantial evidence, Mr. Thompson needed to **actually point** to the specific portions of the evidence that satisfy the claim limitation and **explain** to the jury what they show. *See also Implicit Networks Inc. v. F5 Networks Inc.*, No. 10-4234 SI, 2013 WL 1007250, at *13 (N.D. Cal. Mar. 13, 2013) (finding patentee "has the burden, especially in a technically complex case such as this, to show by expert testimony how the accused

---

[1] While *Intell. Sci. & Tech.* and *Implicit Networks* (cited *infra*) were summary judgment cases, the "standard for ... summary judgment 'mirrors' the standard for [JMOL], such that 'the inquiry under each is the same.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

products actually work" and its expert's "assertions about [certain accused products] are far too generalized and rely too much on technical citations and code for [other accused] products ... to support a claim-by-claim and limitation-by-limitation infringement analysis necessary to meet [patentee's] burden"). Because IBM's evidence for these limitations failed to meet this standard, the Court should grant judgment as a matter of law for these 8 games.

   **b.  *IBM Did Not Prove That 9 of 10 Accused Games Have Multiple Applications*.**

   In attempting to prove that every accused game has multiple applications, as required by the claims, IBM relied entirely on Mr. Thompson's testimony about screenshots of E&P. Mr. Thompson testified that E&P contains multiple applications—e.g., "shop" and "single-player" applications. Tr. 388:23-392:23. He then stated that "all of the [other] Zynga games include multiple applications in the same way as [E&P]" because "they all include a shop" and "some sort of single-player application." Tr. 393:6-9. But he did not discuss any code, documents, or other evidence to support this opinion. As such, with respect to XWF, CSR2, Farmville 2, FVCE, FVTE, Farmville 3, HP, HIR, and WOZ Slots, IBM's only evidence to show that certain subparts of these games could be considered separate "applications" was Mr. Thompson's conclusory "say so." This bare conclusion is insufficient to provide substantial evidence of infringement as a matter of law. *See Paradox*, 388 F. App'x at 981-82; *Intell. Sci. & Tech.*, 589 F.3d at 1184.

   Worse still, with respect to FVCE, FVTE, HIR, and WOZ Slots, Mr. Thompson admitted on cross-examination that pop-up "shops" are part of the *same* application as the one that appears "behind the pop-up." Tr. 503:3-11 (agreeing PTX-3169 and JTX-0318, both showing HIR, do not show a separate "shop" application). But for each of these 4 games the only admitted "screenshots and videos" show that the "shop" is a pop-up. PTX-3142-3149, -3168-3169, -3209-3213; JTX-0301-0302, -0318; *see also* Tr. 731:24-733:10 (Hall) (HIR), 733:11-13 (Hall) (WOZ Slots), 795:20-796:18 (Lemer) (FVTE). Thus, IBM did not show that FVCE, FVTE, HIR, and WOZ Slots

infringe because: (1) IBM's only evidence of multiple "applications" for these 4 games is Mr. Thompson's assertion that they include both a "shop" and "single player" application, (2) the admitted evidence shows that these 4 games use only pop-up shops, and (3) Mr. Thompson admitted that a pop-up "shop" *is not* a separate application from the underlying application.

*ParkerVision, Inc. v. Qualcomm Inc.*, is instructive, where the plaintiff's expert asserted that "the storage capacitors in [defendant's] devices" met the limitation of "generating the baseband signal," "but then admitted on cross-examination that the baseband signal already exists before the current reaches the capacitors." 627 F. App'x 921, 924 (Fed. Cir. 2015). The Federal Circuit held that no reasonable jury could find infringement because the plaintiff made "no attempt to reconcile the two conflicting strands of its expert's testimony," nor "did it introduce any other evidence that might have supported the expert's initial statement." *Id.* Put differently, because a party cannot meet its burden by "rest[ing] its case on [an expert's] unexplained self-contradictory testimony" the Court should find no infringement for at least FVCE, FVTE, HIR, and WOZ Slots. *Id.*; *see also Johns Hopkins Univ. v. Datascope Corp.*, 543 F.3d 1342, 1348-49 (Fed. Cir. 2008) ("no reasonable jury [could find] that the [accused] device … [infringed] based on [the expert's] opinion, given his contradictory testimony").

### c. *IBM Did Not Prove Any "Single-Player" Application in 9 of 10 Accused Games Includes "Interactive Services."*

Claims 8 and 13 both require that the "applications" in each game "include interactive services." According to Mr. Thompson, "interactive services" means that, as a user interacts with an application in an accused game, there are "interactions" between that application and a server. *See, e.g.*, Tr. 393:10-18 ("Q. … Claim 13 requires that the applications include interactive services, so what are the interactive services in the applications in Zynga's games? A. So the interactive services are as you interact with these applications, there's going to be transmissions back to

5

Zynga's servers, depending on what the application is."). As explained above, Mr. Thompson testified that XWF, CSR2, Farmville 2, FVCE, FVTE, Farmville 3, HP, HIR, and WOZ Slots include "a shop" and "some sort of single-player application." Tr. 393:6-9. To show that the "single-player" applications include "interactive services," IBM relied entirely on Mr. Thompson's testimony that "there's going to be transmissions [with] Zynga's servers, depending on what the application is," and that the bulk-admitted .HAR files identified on PTX-3500, "confirm that there are interactions between the game and server when the user plays with the applications." Tr. 393:10-397:9. But Mr. Thompson never provided any analysis or explanation to show that any "single-player" application of each of these 9 games includes "interactive services."

These bulk-admitted .HAR files and Mr. Thompson's conclusory assertions that a "single-player" application exists in these 9 games and includes "interactive services" are improper for substantially the same reasons as stated in Section I.A.1.a. Mr. Thompson failed to actually connect any "interaction" in the .HAR files with any "single-player" application of these 9 games. Nor did he even discuss their contents for any of the 9 games or show them to the jury. Mr. Thompson cannot simply declare that bulk-admitted and unexplained .HAR files—which are unreadable to a layperson—contain the evidence that shows how these 9 games infringe the claims. *See Intell. Sci. & Tech.*, 589 F.3d at 1184; *Paradox,* 388 F. App'x at 981-82. Because IBM relies solely on Mr. Thompson's improper, conclusory statements to show that the purported "single-player" applications include "interactive services," the Court should grant judgment as a matter of law.

### d.  *IBM Did Not Prove That Any Web-Based Game Infringes.*

Mr. Thompson testified at the beginning of his direct examination that "Zynga's mobile and web-based games infringe claims 8 and 13 of the '849 patent." Tr. 345:5-12. Mr. Thompson never again substantively discussed web-based games during his testimony; he did not even say *which* of Zynga's Games are web-based—for example, Farmville 2 is *only* offered as a web-based

game, and HIR has both mobile and web versions. Nor did Mr. Thompson offer any evidence or testimony that the web versions of those games operate in the same manner as the mobile versions.

Mr. Thompson's mere introductory statement—with no other analysis or explanation of web-based games in the record—is not substantial evidence of infringement of Zynga's web-based games. *See Paradox*, 388 F. App'x at 981-82; *Intell. Sci. & Tech.*, 589 F.3d at 1184.

### 2. Claim 8 of the '849 Patent.

### a. *IBM Did Not Prove That Any of Zynga's Games "Stor[e] a Predetermined Amount of … Advertising Data."*

IBM's only evidence of infringement of this limitation was to introduce a document from Merge Dragons (which the jury found did not infringe) discussing an "asset map" and showing that the game (which the jury found did not infringe) will store "a predetermined *number* of advertisement *units*." Tr. 449:24-455:25; PTX-1478. According to Mr. Thompson, "assets" are files that "contain one or more objects" and the "asset map" is a list of any asset files "that the game needs to have in order to start." Tr. 401:13-19, 449:24-451:21. Drawing all reasonable inferences in IBM's favor, Mr. Thompson showed that an "asset map" (as used in Merge Dragons) defines "*the number* of [assets] that may appear in each game." But that does not meet the Court's construction, D.I. 501 at 6-8,[2] and (even if it did) would not support the verdict as to any *other* accused game.

**First**, IBM incorrectly argued that Mr. Thompson's testimony demonstrates a "predetermined amount of advertising data" because Mr. Thompson testified that each asset in an asset map has "an amount of data associated with it." Tr. 450:8-17. This testimony is irrelevant because it is not what the claim (as construed) actually requires. IBM's reading would render the

---

[2] Zynga raised this issue multiple times at trial, and the Court noted Mr. Thompson's testimony was "consistent with his report, but there may be a JMOL issue and, you know, the Court has [its] prior ruling, and so, … IBM, you may have some issue." Tr. 457:16-22.

claim term meaningless. A purported requirement that a file has a finite (and therefore knowable) size does not add anything to the claim because all files have finite sizes. Further, as Mr. Thompson admitted, the "asset maps" include *all* assets "that the game needs," not just advertising-related assets. Tr. 401:13-19, 449:24-451:21; *see also* Tr. 327:5-14 (Erenturk) ("Q. So the asset map is a list that identifies all of the assets that may be displayed to the user, including assets in both the offers and the shop items, correct? A. Yes."). So even if the *file* had a finite size, and that somehow meant the size was predetermined, that would not be evidence that the amount of *advertising* data in the file is predetermined. Thus, Mr. Thompson's testimony that an asset map lists items that have amounts of data does nothing to demonstrate that the user device will store a predetermined amount of *advertising* data (vs. data generally), as the Court's claim construction requires.

**Second**, IBM provided no evidence showing that each of Zynga's Games store a "predetermined amount of advertising data." Mr. Thompson relied on the asset map and did not offer any source code or documentation specific to *these games* that defines an amount of advertising data that should be stored. He showed a single piece of evidence related to a single game and declared, with no support, it was evidence that applied to other games, built by other studios. Tr. 449:24-461:22; *see, e.g.*, Tr. 684:13-685:11 (Terrell), 731:24-732:5 (Hall), 785:15-16 (Lemer). That is not sufficient. *See CommScope Techs. LLC v. Dali Wireless Inc.*, 10 F.4th 1289, 1297 (Fed. Cir. 2021) (finding no substantial evidence when there was "a lack of evidence" that the accused product operated in a specific way, and "unrebutted evidence showing the opposite").

In addition, Zynga's technical expert, Dr. Almeroth, examined the source code and found that "the only check that the game does is to see if [an] item is already on the device or not[.] And so … the source code shows … that it's checking for a number of items instead of some predetermined amount of data." Tr. 931:11-932:11. Further, multiple fact witnesses provided

unrebutted testimony that at least HIR and E&P do not "determine or limit": (1) "the overall amount of in-app offer data that is sent to [a] user," (2) "the amount of in-app offer data that is stored on the user's device," or (3) "the amount of in-app offer data that is sent or stored." Tr. 730:12-731:6 (Hall), 760:5-21 (Wilkman). Accordingly, the Court should grant judgment as a matter of law as to jury's unsupported verdict that Zynga's Games infringe claim 8.

### b. *IBM Did Not Prove That Any of Zynga's Games "Structur[e] Advertising So That It May Be Selectively Supplied to and Retrieved at the Receptions Systems."*

Claim 8 requires structuring "advertising so that it may be *selectively supplied to and retrieved at the reception systems* for presentation to the respective users *in accordance with [user] characterizations*." The plain and ordinary meaning of this limitation, as the PTO previously explained, "***requires that advertising is supplied to users 'selectively' based on the characterizations of the users*.**" JTX-0003 at 994. In other words, advertising must be selectively supplied to the user's device ("the reception systems") based on the user characterizations, as all technical experts agreed. *See* Tr. 521:2-20 (Thompson), 667:12-19 (Martin), 933:9-20 (Almeroth).

IBM offered **no** evidence that Zynga's Games selectively supply advertising **to user devices** based on user characterizations. Instead, the theory IBM presented at trial was that claim 8 requires only the selective "presentation" of ads to the human user, and supplying *all* ads to the user's device would still infringe. D.I. 509 at 2 ("Claim 8's plain language requires advertising to be presented in accordance with user characterizations"); Tr. 443:11-444:15, 445:8-10. For example, Mr. Thompson testified that Zynga's Games meet this limitation because advertising is "present[ed]" to the user "based on [user] characterizations." Tr. 445:8-10. But he did *not* testify that advertising is *supplied to the user's device* based on user characterizations. To the contrary, he said that the user's device gets what is listed in the asset map—without linking the content of the asset map to user characterizations. Tr. 417:15-430:2, 443:11-444:5.

IBM also relied on testimony from Zynga witnesses, none of which was specific to selectively supplying advertising *to user devices*, as distinct from displaying advertising to users. For example, Mr. Thompson pointed to deposition testimony from one of Zynga's employees, who was asked whether certain games "selectively supply different offers to different *players* based on what segment they fall into." Tr. 448:11-18. That does not show that these games selectively supply advertising *to devices* based on user characterizations, as the claim requires.

Moreover, not "only [is] there a lack of evidence to show that [Zynga's Games meet] the proper construction of the claims, there is unrebutted evidence showing the opposite." *See CommScope*, 10 F.4th at 1297. Mr. Hall testified, for HIR, "every offer is sent to every player, ***every device***." Tr. 731:7-12. Mr. Wilkman similarly testified, for E&P, "***every*** user[] ***device*** receive[s] the same offers." Tr. 758:9-14. And Mr. Lemer testified, for HP, "all users have all possible offers" on their phones. Tr. 793:23-795:8. If every user receives every offer, then the offers are not being selectively supplied to the device based on user characterizations.

### 3.    Claim 13 of the '849 Patent.

#### a.    *IBM Did Not Prove That Any of Zynga's Games Pre-Fetch Advertising Objects.*

Claim 13, as construed, requires "pre-fetching advertising objects and storing them at a store established at the reception system in anticipation of display concurrently with the application." D.I. 501 at 9. Advertising objects must be "'prefetched' in the sense that they are retrieved before the user has requested the page in connection with which they are to appear." *Id.* IBM did not prove that Zynga pre-fetches ads, because the evidence indisputably demonstrated that the accused ads (i.e., in-app offers) are downloaded in response to a user's request to install or launch the game. Each of those actions—i.e., a request to (1) install the game or (2) launch the game—constitute *a* request for the page on which the advertising is to appear.

According to Mr. Thompson, the claimed "advertising objects" include "asset objects" and

"JSON objects" that are retrieved when the user opens the game on their phone, called game launch, Tr. 506:10-22, or "when a user [installs] a Zynga game from an app store," which includes downloading "the data for the information events in the game," Tr. 503:16-504:7. Notably, he only asserts that objects downloaded during *launch,* not installation, are infringing. Tr. 506:10-22. But objects downloaded at launch are downloaded at the *same* time as the user's "request [for] the page on which" the advertising objects will appear, because the request to open the game is also a request to open the game's "pages." Put differently, Zynga does not pre-fetch because Zynga's Games retrieve the "asset objects" and "JSON objects" ***simultaneously with or after*** the user request. That is not pre-fetching under the Court's construction, because no accused ad objects are "retrieved ***before*** the user has requested the page in connection with which they are to appear."

As context for why Zynga's Games simply do not use pre-fetching, consider Mr. Filepp's explanation of the purported improvement in the '849 patent. Mr. Filepp, an inventor, explained to the jury that to request a page under his "inventive approach," the user "make[s] a request for a set of instructions" over a network "***to a server.***" Tr. 210:5-213:15. The server then processes the request and sends back a response on how to build the page that the user requested. *Id.* Mr. Filepp and IBM's counsel acted this process out using magnets, where IBM's counsel (at the reception system) "pass[ed] … the request" to Mr. Filepp (at the server) to illustrate the request going over the network. Tr. 210:5-17. In Zynga's games, however, the information needed to build the "pages" within the game are retrieved at the same time as or before the accused objects, not retrieved on demand like a webpage. Indeed, there was no dispute that, when games are installed, the device receives *all* of the code needed to display the game's "pages." Tr. 503:16-504:7 (Thompson), 728:9-11 (Hall), 750:20-23 (Wilkman), 790:12-18 (Lemer), 907:1-10 (Almeroth). Mr. Filepp's own testimony thus confirms the accused objects are only *fetched*—not *pre*-fetched.

11

Even if the Court were to accept Mr. Thompson's theory as correct, Mr. Thompson still failed to identify any "asset object" or "JSON object" that was *actually* pre-fetched. Instead, Mr. Thompson's testimony only supports the conclusion that Zynga's games are *capable* of pre-fetching but can **also** retrieve the accused advertising objects in a *non-infringing manner*. Proof that the accused games are capable of infringement is insufficient to prove infringement of a method claim. *Tex. Advanced Optoelectronic Sols., Inc. v. Renesas Elecs. Am., Inc.*, 895 F.3d 1304, 1327 (Fed. Cir. 2018) (reversing infringement verdict when "there is no evidence of any use of [accused] products that directly infringes the method claims.").

Mr. Thompson acknowledged that many "advertising objects" could not be prefetched, even under his own theory. Again, Mr. Thompson testified that the "asset objects" and "JSON objects" that practice the claim are those objects that are retrieved during game launch. Tr. 506:10-22. Mr. Thompson then provided examples of these objects in E&P via a demonstrative. *See* Ex. A at PDX-5.57. On cross-examination, however, Mr. Thompson admitted Zynga's Games can *also* include the "asset objects" and "JSON objects" in the game's binary that is downloaded when the user first installs a game on their phone. *See* Tr. 503:16-504:7 ("Q. The binary that is downloaded from the app store can include JSON and assets, true? A. True."). Data downloaded upon game installation is not infringing according to Mr. Thompson.[3] Tr. 505:12-22. And he further admitted that the identified "examples" of objects in E&P may not have been pre-fetched at all. Tr. 506:1-507:11. In fact, when asked point blank whether any of the examples "are pre-fetched during game launch," he testified that he could not "recall whether these specific ones were or not." *Id.*

**This cannot be substantial evidence of infringement,** let alone for the particular games

---

[3] This is consistent with unrebutted testimony from multiple fact witnesses explaining that elements that make up in-app offers come in the game's binary. Tr. 322:7-11, 323:23-324:4, 728:3-8, 750:16-751:9, 793:12-22.

found to infringe. Mr. Thompson failed to identify any "asset objects" and "JSON objects" that were actually pre-fetched and acknowledged that the "objects" can be retrieved in a non-infringing manner. Mere capability alone is never enough to prove a method claim and a reasonable jury would have *even less* basis to infer actual performance when Mr. Thompson concedes that a user's device can also retrieve elements of in-app offers in a non-infringing manner.

**B.    The Court Should Grant JMOL Or A New Trial On Invalidity of the '849 Patent.**

**1.    A Properly Instructed Jury Could Only Find That Claims 8 and 13 of the '849 Patent Are Invalid Due To The On-Sale Bar.**

Zynga proved that before July 15, 1987, an embodiment of the claimed invention was the subject of a commercial offer for sale and ready for patenting. IBM agreed that the invention was ready for patenting. And Mr. Filepp, an inventor, agreed that there were pre-critical date offers for future delivery of the Trintex Service, i.e., those made to Coldwell Banker and Dreyfus. Tr. 237:13-240:10; DTX-474; DTX-475. The only question was whether these offers were commercial offers to perform the patented method. Any reasonable, properly instructed jury could only find these offers were commercial and offered performance of the claimed invention.

Zynga proved that the offers were commercial—IBM offered to perform a service and received compensation. No reasonable jury could find the offers were primarily for experimentation or that commercial exploitation was merely incidental to the primary purpose of experimentation. For example, the evidence repeatedly referred to the contracts as "commercial" and to Trintex's advertisers as "commercial clients." *E.g.*, Tr. 246:22-247:2; DTX-1391 at 41. Trintex received more than $500,000 in revenue from "advertising and other fees" in 1987. Tr. 246:2-14. Whether IBM wanted to keep improving its product is irrelevant—the trial record shows that the contracts were not "primarily for experimentation" or incidental to a commercial sale.

Zynga also proved that the offers were to perform the patented method. The contracts

themselves show that Trintex agreed to perform ("carry out") every limitation of the claims except for pre-fetching. *See, e.g.*, Tr. 955:9-956:15. Claim 8 does not require pre-fetching, so the Court should grant JMOL of invalidity as to claim 8 based on the language of the contracts alone. And a reasonable, properly instructed jury would also find that the relevant trial evidence established that the Dreyfus and Coldwell Banker contracts were offers to perform prefetching.

The Federal Circuit has repeatedly and "explicitly rejected a requirement that the details of the invention be disclosed in the terms of sale." *Helsinn Healthcare S.A. v. Teva Pharms. USA, Inc.*, 855 F.3d 1356, 1370 (Fed. Cir. 2017); *see also RCA Corp. v. Data Gen. Corp.*, 887 F.2d 1056, 1060 (Fed. Cir. 1989). Here, Trintex's development documents (e.g., functional objectives, specifications, technical reviews, planning documents, etc.) and source code from the relevant time periods make clear that Trintex was offering to pre-fetch advertising objects. For example, Trintex planned to store, at the user terminals, advertising objects that were targeted for specific users or groups of users. Tr. 946:5-15; DTX-0471; DTX-0472. The offered service would (1) prefetch a certain amount of advertising data when the user logged into the service and (2) prefetch advertising objects when an "ad queue" stored on a user's reception system dropped below a threshold. Tr. 946:16:-947:16, 947:24-948:11; DTX-498. This functionality was implemented through an "Ad Manager" that was described in technical documents in 1985 and 1986 and implemented in source code in late 1986. Tr. 948:8-11; 950:24-951:16; DTX-0181. Mr. Filepp also agreed that Trintex practiced the asserted claims when it was launched. Tr. 252:6-253:4. IBM's defense at trial was that Trintex was considering "alternative implementations." But no witness could identify a contemporaneous document supporting that argument, or connecting one of the alternatives to a specific time period, nor could any witness recall if Trintex created any source code, testing, or technical specifications for those hypothetical implementations. *See, e.g.*,

Tr. 256:20-258:18. And IBM presented zero evidence showing Trintex considered any of these "alternatives" for the launch at issue. To the contrary, there was unrebutted testimony that these "alternatives" were developed by a Trintex team focused on future implementations, rather than for the launch at issue, and/or were never considered for the launch. Tr. 862:24-865:4. In other words, IBM offered no evidence apart from twenty-year-old "say so" that an alternative was being considered for the launch at issue in the contracts and failed to rebut contrary evidence.

IBM's requested instruction that a commercial offer to perform the patented method requires "that the party making the offer [] be legally bound to perform the patented method if the offer is accepted" explains how the jury reached this erroneous result. Tr. 1290:18-24. "When a jury instruction is erroneous, a new trial is warranted unless such error is harmless"—and an error is only "harmless if it is 'highly probable' that the error did not contribute to the judgment." *Harvey v. Plains Twp. Police Dep't*, 635 F.3d 606, 612 (3d Cir. 2011). First, this instruction was legally wrong. In *Pfaff*, for example, the Supreme Court did not impose this requirement on the acceptance of a purchase order for new sockets (which had not yet been reduced to practice). Instead, the Court noted that *the sockets that were eventually sold*—after reduction to practice—"contained all the elements of the invention claimed in the [asserted] patent." *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 67-68 (1998). The same is true here; as IBM did not dispute at trial, the service that was eventually provided to fulfill the offer for sale *was in fact the claimed invention*. And as Zynga showed at trial, at the time Trintex made the offer, the only way Trintex *could* fulfill the contract was by practicing the claimed invention, showing that Trintex both *knew* it was offering the claimed invention and *intended* to fulfill the contract by practicing the claimed invention—whether the contract specified those details or not. That is all the law requires.

IBM's instruction was pulled from out-of-context language from *Plumtree Software, Inc.*

*v. Datamize, LLC*, 473 F.3d 1152 (Fed. Cir. 2006). But that language merely resolved the factual question presented in that case—whether there was an offer to perform the claimed method as opposed to an offer to provide a product that resulted from the performance of that method. There, the asserted patents claimed (1) a method for creating a computer program and (2) the software for creating a computer program which could be "used to create customized kiosks." *Id.* at 1155. The contract at issue was ambiguous as to whether it was an offer for sale *of the customized kiosks*, versus an offer to perform the patented method. *Id.* at 1162-63. The Federal Circuit analyzed whether, notwithstanding the district court's erroneous focus on the non-patented kiosk product, the commercial offer was nonetheless one to perform the method. *Id.*

There was no analogous dispute in this case. Here, the jury was simply asked to decide whether Trintex's commercial contracts reflected an offer to sell the invention claimed by the '849 patent. There was no dispute that Trintex was legally bound to perform the services promised in the contract, and as Zynga showed, the *only* way that Trintex was prepared to—and in fact did— perform the contract was by performing the claims of the '849 patent. As explained above (at 14- 15), none of IBM's purported alternatives to fulfilling the contracts actually existed. The only basis on which a reasonable jury might have found in IBM's favor was by relying on the Court's erroneous instruction, which IBM used to argue that the offer for sale had to include a contractual commitment to perform the service it was offering in the specific way claimed by the '849 patent. *See* Tr. 1179:1-9 (closing). The error was therefore not harmless and requires a new trial.

### 2. Claim 13 Is Not Patentably Distinct From The Claims Of The '209 Patent.

Zynga showed that claim 13 is obvious in view of the claims of the '209 patent. Tr. 964:8- 970:10. IBM disputed only whether the claims of the '209 patent make obvious "configuring the advertising as objects that include advertising data" as required by claim 13. Tr. 1093:18-1094:3, 1094:17-1095:5. No reasonable jury could credit those arguments because claim 1 of the '209

patent recites "*structuring the additional information [i.e., the advertising data]*, separate from applications so that the additional information may be *selectively supplied to* and retrieved at the reception systems *for presentation to the respective users in accordance with the characteristics* established for the respective reception system users and concurrently with a requested application." IBM did not dispute that "advertising" in claim 13 would have been an obvious variation of the "additional information" in claim 1 of the '209 patent, Tr. 965:19-24; Tr. 21:11-22:15; and a POSITA would have understood the additional information displayed "along with" and "concurrently with" the applications would need to be configured as objects. *See* Tr. 967:11-969:3. Indeed, structuring ad objects is the only way the '209 patent discloses structuring the additional information for concurrent display. *Id.*; *see also* DTX-1166.38.

## C.    IBM Did Not Provide Substantial Evidence Of Willfulness.

To prove willful infringement, IBM had to show "deliberate or intentional infringement." *SRI Int'l, Inc. v. Cisco Sys.*, 14 F.4th 1323, 1330 (Fed. Cir. 2021). Evidence that the defendant had "[k]nowledge of the asserted patent and evidence of infringement" alone is "not sufficient" to support a verdict of willfulness as a matter a law. *Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 988 (Fed. Cir. 2021). Rather, IBM was required to "show that the accused infringer had a specific intent to infringe at the time of the challenged conduct." *BASF Plant Sci., LP v. Commonwealth Sci. & Indus. Rsch. Org.*, 28 F.4th 1247, 1274 (Fed. Cir. 2022).

IBM failed to provide any evidence that Zynga had such specific intent and instead relied on evidence that, at best, shows only Zynga's (insufficient) knowledge of IBM's patent and IBM's shifting allegations about other products. IBM asserted that Zynga's purported infringement was willful based on a 2014 letter accusing the "Zinga.com" business website of infringing the '849 patent. Tr. 694:4-10; Tr. 563:6-14; *see also* JTX-0006. This letter did not accuse (of infringing the '849 patent) any of the games that the jury found to infringe—indeed, the Zynga.com website did

17

not even host any web-based games. Tr. 694:15-695:1. Nor does this letter provide any evidence that Zynga developed and released the 10 infringing games with the subjective intent to infringe the '849 patent. Indeed, this facially insufficient 2014 letter is IBM's primary evidence for asserting that Zynga was willfully infringing from 2016 until IBM sent its next letter in 2020, and IBM's inability to show that Zynga was willfully infringing during that period is fatal to the entire willfulness finding. *See CR Bard Inc. v. AngioDynamics, Inc.*, 675 F. Supp. 3d 462, 486 (D. Del. 2023) (granting JMOL because the "time-unbounded willfulness verdict here lacks substantial evidence" and covered "conduct across a span of years" despite evidence that demonstrated only what the defendant "knew at some other point."). Zynga asked the Court to *avoid* this problem by limiting the willfulness claim to after 2020, but IBM objected and the Court (while acknowledging that the time period was an issue) went along with IBM's request for an *unbound* willfulness question for the jury. Tr. 1110:12-17, 1125:23-1128:12.

IBM also submitted evidence that in 2020—after 5 years of silence—IBM sent Zynga another letter asserting that a particular game—Game of Thrones Slots—infringed the '849 patent on a wholly different basis than its original allegations. JTX-0008. The jury did not find that this game infringed, so this letter provides no basis for willfulness. Indeed, there is *no evidence*, for any of the 10 games found to infringe, that IBM ever gave Zynga notice of its allegations, let alone evidence that Zynga offered those games with the subjective intent to infringe.[4]

Instead, the unrebutted evidence shows that Zynga had a good-faith belief in its defenses to IBM's accusations to infringement and so could not have had the subjective intent to infringe. *See Roche Diagnostics Corp. v. Meso Scale Diagnostics*, LLC, 30 F.4th 1109, 1119 (Fed. Cir.

---

[4] IBM's heavily emphasized and prejudicial focus on its other licenses and verdicts involving unrelated third parties is irrelevant. Whether a third party's products practice the '849 patent (or that the party decided to avoid litigation) says nothing about whether Zynga's games do.

2022) (explaining that the defendant's "subjective belief that it wasn't infringing … mean that [the defendant] couldn't have acted with knowledge that the acts it brought about constituted patent infringement.") (citations and internal quotations omitted). Zynga explained the basis for its good-faith belief that it didn't infringe in 2020. Tr. 565:18-566:5; JTX-0008. And Zynga's belief was repeatedly vindicated—first, when the Court granted summary judgment against one of IBM's two infringement theories, and second, when the jury largely agreed with Zynga that its games do not infringe, finding no infringement of the '849 patent for *23* out of the 33 accused games. D.I. 529.

Because IBM's arguments that Zynga deliberately infringed since 2014 or 2020 were frivolous, IBM instead pivoted to a willful blindness argument, but it likewise fails to provide a basis for the jury's willfulness verdict. Specifically, over Zynga's objection (Tr. 303:13-304:12), IBM introduced evidence that a handful of Zynga's employees, out of the approximately 600 engineers that Zynga employs (Tr. 724:4-8), did not read the patents or form legal opinions as to whether Zynga infringed, even though (a) IBM did not establish that these employees had legal training and (b) many of them explained that it was not their "responsibility at Zynga to review patents." *See, e.g.*, Tr. 325:6-8 (Erenturk), 676:6-8 (Klepac), 677:21-23 (Nikulainen), 678:24-679:1 (Quinney), 734:18-20 (Hall), 770:14-16 (Wilkman), 802:17-19 (Lemer). But this willful blindness theory was both waived, D.I. 525 n.37, Tr. 1147:17-22, and wrong as a matter of law. Under the willful blindness standard, IBM was "require[d] … to show" not just "deliberate indifference to a known risk of infringement" but that Zynga "took *deliberate actions* to avoid confirming infringement." *Unwired Planet, LLC v. Apple Inc.*, 829 F.3d 1353, 1364 (Fed. Cir. 2016). The mere fact that certain cherry-picked employees did not analyze infringement does not show "deliberate actions," particularly given that the Federal Circuit has noted that it is "unremarkable that the engineers—as opposed to [a large corporate defendant's] in-house or

outside counsel—did not analyze the patents-in-suit themselves." *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 930 F.3d 1295, 1309 (Fed. Cir. 2019). Moreover, Zynga presented unrebutted testimony that its CTO would *never* discourage its engineers from reading patents (Tr. 695:13-696:5) and that when Zynga received a letter accusing it of infringement, its practice was for the legal team to evaluate the letter, reaching out to the CTO as needed for technical assistance, with the CTO further reaching out to others at the company if he lacked necessary technical experience. Tr. 695:2-12. Far from taking "deliberate actions to avoid confirming infringement," *Unwired Planet*, 829 F.3d at 1364, the unrebutted testimony was that Zynga's legal team, CTO, and others investigated claims of infringement. Accordingly, this "willful blindness" evidence cannot justify the verdict.

**D.    IBM's Improper Reliance On A Prior Verdict and Non-Comparable Licenses To Prove Infringement, Validity, and Damages Requires a New Trial.**

Before trial, Zynga warned that IBM intended to use non-comparable licenses to improperly argue infringement, willfulness, and damages to the jury. Zynga objected to the introduction of these license amounts and any argument that the amounts show the value of the '849 patent (D.I. 485, Ex. L, Zynga MIL No. 1). Zynga also objected that its decision to defend itself in court rather than agree to a license (as others had) was evidence of infringement, willfulness, and damages (D.I. 485, Ex. L, Zynga MIL No. 2).

The Court precluded IBM from relying on the non-comparable license amounts in opening and for purposes of arguing damages, but permitted IBM to rely on the licenses and their *amounts* (over Zynga's objection) to argue secondary considerations and willfulness. D.I. 503 at 5-7; Tr. 1301:18-1302:3. The Court also denied Zynga's MIL No. 2 in substantial part and held that "the jury can be informed that, while other companies willingly agreed to take licenses for the patents, Zynga has not agreed to do so." D.I. 503 at 6.

IBM's conduct at trial, however, proves that IBM's purported desire to rely on these license

amounts to prove secondary considerations of non-obviousness and willfulness was a pretext. Regarding secondary considerations, the licenses and verdict are entirely irrelevant because (1) the only relevant obviousness question for the jury at trial (with respect to the '849 patent) would be whether claim 13 was obvious over the '209 patent, (2) nothing in the licenses was tied to claim 13, Tr. 313:5-316:7, and (3) binding precedent requires that "evidence of secondary considerations must have a 'nexus' to the *claims*," Ex. B at 16-17 (quoting *Henny Penny Corp. v. Frymaster LLC*, 938 F.3d 1324, 1332 (Fed. Cir. 2019)); *see also* Tr. 317:13-319:19 (overruling Zynga's related objection). Further, IBM *never* used the licenses or verdict as evidence of secondary considerations. Instead, after IBM told the Court that they were relevant to secondary considerations, its validity expert, Dr. Jeffay, provided *zero* testimony that secondary considerations existed or that there was a nexus to the patented features. *See, e.g.*, Tr. 1092:20-1095:5. The licenses and verdicts were likewise totally irrelevant to willfulness since Zynga's accused games are nothing like the web-based third-party ad businesses of Groupon, Google, Amazon, etc. It makes no sense to suggest that because Zynga had heard some other party—providing other products and services—licensed or infringed the '849 patent, Zynga must likewise infringe. *See, e.g.*, *ICU Med., Inc. v. RyMed Techs., Inc.*, 752 F. Supp. 2d 486, 491 (D. Del. 2010) (noting "[t]he only relevant question for infringement is whether *the accused product* contains each and every limitation of the asserted claims"). Put simply, there is *no proper purpose* for this testimony and, even if there was, IBM made no effort to use the evidence for any such purpose.

IBM instead exploited the admission of this irrelevant and prejudicial evidence to prop up its principal trial theme, repeatedly prejudicing Zynga and necessitating a new trial. IBM repeatedly and improperly implied that Zynga infringes because others took a license. During its opening statement, IBM's counsel told the jury that "this is a case about a company who refuses

to take responsibility for its actions" and that while "Amazon paid for a license, Google paid for a license, Yahoo! paid for a license … Zynga refuses to pay for the patents," directly and improperly implying that Zynga needs a license because other companies agreed to one. Tr. 138:4-6, 138:22, 139:25-140:4; *see also, e.g.*, Tr. 141:6-7 ("IBM has licensed these patents to dozens of companies."); Tr. 141:2-3 ("[Zynga] refuse to take responsibility and that's why we're here.").

Similarly, IBM made its "Bedrock Fact No. 2" that "[e]ven though IBM told Zynga about its patents before this lawsuit *and that others paid to use IBM's patents, Zynga refused to pay IBM* or to redesign its products and *kept on infringing*." Tr. 159:4-7. IBM emphasized the point: "we told them that *others used the patents*. They *refused to pay* or change the product, and they just *kept on infringing*." Tr. 159:10-12. IBM also argued "it's very unusual for IBM to be in a jury trial like this one protecting its patents" and "[i]t's only happened one time before against a company called Groupon," telling the jury "it was actually in this room, and there was a jury sitting in those seats, they sat through the trial, and at the end of the trial, they returned a verdict that Groupon infringed IBM's patents." Tr. 141:11-18. This assertion served only to suggest that Zynga needed a license because other companies had infringed. Thereafter, IBM attempted to improperly sway the jury with Mr. Filepp by discussing the Groupon verdict and license. Tr. 229:4-18. IBM continued the theme on cross of Zynga's witnesses, emphasizing that "IBM told Zynga that others, like Amazon and Google, paid to use IBM's patents," and that Amazon and Google took licenses. Tr. 709:8-11 (Terrell cross question); 981:25-983:17 (Almeroth cross questions).

IBM hammered the suggestion that Zynga must infringe in light of these prior licenses in its closing. Making virtually no attempt to walk through its infringement arguments, IBM instead argued its patents are "what all these companies are using. We saw they take license agreements, their technology is built on IBM's patents. But they paid for it. Zynga refuses to pay." Tr. 1177:11-

22

23. IBM repeated its "Bedrock Fact No. 2" that "others paid to use IBM's patents" but "Zynga refused to pay." Tr. 1184:12-15. IBM also emphasized these licenses and the Groupon verdict's finding of willful infringement and $82.5 million damages award. Tr. 1186:15-1188:2.[5]

In addition to prejudicially implying that the licenses and verdict were evidence of infringement, IBM also expressly and improperly used the license *amounts* as evidence as to the proper damages amount, in direct violation of the Court's earlier ruling, D.I. 503 at 6. Over Zynga's objection, IBM made these non-comparable license amounts and the Groupon verdict the focus of Mr. McBride's direct examination. Tr. 535:8-542:23. With the floodgates open, Mr. McBride testified regarding Google's $35 million payment, Amazon's $49.8 million payment, LinkedIn's $30 million payment, Twitter's $35 million payment, Facebook's $20 million payment, the Groupon jury's finding of infringement and award of $82.5 million, Groupon's subsequent $57.5 million license, and other non-comparable licenses. Tr. 535:8-542:23; 548:10-15.

IBM even went so far as to have its damages expert explain that these indisputably irrelevant license amounts informed the proper royalty amount. During direct examination of Mr. Persechini, IBM's counsel showed slide PDX-1.4 of Mr. McBride's demonstrative to the jury—which highlighted the license amounts that Google, Amazon, and Groupon paid IBM. Tr. 633:17-635:6; Ex. C at PDX-1.4. IBM specifically asked about the licenses and the amounts over Zynga's objection. *Id.* Then, despite Zynga's objections and the Court's ruling forbidding it, D.I. 503 at 6, Mr. Persechini testified that the agreements "***understate[]*** the actual value that IBM got for these licenses." Tr. 634:17-635:13. The *only reason* for this testimony was to improperly suggest that

_____

[5] By contrast, when it came to the actual details of IBM's burden of proving infringement, IBM's counsel urged the jury not to concern itself with the details, telling the jury if you "believe IBM's case" "it's very easy, you can check every box for every game. It's not your job to go through … the exhibits like Mr. Thompson did." Tr. 1244:15-1245:8.

these payments were too low so the jury should award even higher damages.

Given the repeated emphasis of these irrelevant licenses and their amounts for improper and prejudicial purposes, it "cannot [be] sa[id] that it is highly probable that the [] court's admission of this evidence did not affect [Zynga's] substantial rights." *Becker v. ARCO Chem. Co.*, 207 F.3d 176, 179-80 (3d Cir. 2000). IBM's repeated exploitation of the Court's permission to discuss its prior licenses crossed the line into "improper statements" that "made it reasonably probable that the verdict was influenced by prejudicial statements." *Masimo Corp. v. Philips Elec. N. Am. Corp.*, No. CV 09-80-LPS, 2015 WL 2379485, at *13 (D. Del. May 18, 2015) (quotation marks and citations omitted). The Court should grant a new trial, at minimum on damages.

**E.    The Court's Limitations on Use of the Specification Requires a New Trial.**

At IBM's behest, the Court incorrectly prevented Zynga from relying on the specification for permissible purposes. *See* D.I. 503 at 4-5. Specifically, at IBM's urging, the Court expanded its ruling on IBM's MIL 3 to prevent Zynga's experts from using the specification to explain or illustrate how a POSITA would understand the plain and ordinary meaning of *non-construed terms*. PTC Tr. 28:19-29:2. Zynga was prejudiced in two respects.

**First**, after the Court's ruling, Zynga asked for additional construction of the term "selectively supplied" in claim 8 of the '849 patent. D.I. 506 at 1-3. Zynga explained that "the ordinary and customary" meaning of a claim term *must* be judged from the perspective of a POSITA and that, "[i]mportantly, the [POSITA] is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but *in the context of the entire patent, including the specification*." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). For this reason, both parties' expert reports relied on the specification and prosecution history in assessing and explaining the plain and ordinary meaning of unconstrued claim terms. But the Court denied Zynga's request, preventing the jury from hearing relevant testimony about how a POSITA

24

would understand the term's meaning in context. D.I. 516.

**Second**, the Court's rulings prevented Zynga from comparing the specifications of the '209 and '849 patent, Tr. 621:5-12, and from tying the fact that the specifications are the same to obviousness-type double patenting, Tr. 623:10-12, 624:7-625:3; *see also* Tr. 623:1 ("the specification is not relevant for the standard"). A factfinder *can* properly "examine[] the specifications of both patents to ascertain any overlap in the claim scope for the double patenting comparison." *Geneva Pharms., Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1385 (Fed. Cir. 2003); Tr. 620:4-9. The prejudice was exacerbated by IBM's argument that the concept of "objects" did not exist in the '209 claims—even though "objects" are claimed in the '849 patent, and the shared specification repeatedly equates "structuring" with structuring *objects*. *E.g.*, DTX-1166 at 3:35-44, 3:57-67, 11:12-23, 15:1-7. The Court's ruling prevented Zynga from rebutting IBM's argument by explaining a POSITA would understand the plain meaning of "structuring" in the '209 patent to refer to structuring *objects* in light of the specification. *See, e.g.*, Ex. D (Almeroth Op. Rep.) ¶¶ 1790-805, 1914-927.

## II.    ZYNGA IS ENTITLED TO JMOL ON THE '719 PATENT

No reasonable jury could find that E&P infringes claim 1 of the '719 patent. Claim 1 requires "configuring the server … to execute view-generating … logic associated with the application." "View-generating logic" is construed to mean "program code that generates a screen or window representation of a subset of the model that the application chooses to display," and "view generating logic does not create new model data (unlike controller data) but merely reformats model data for display." D.I. 516 at 6. Mr. Thompson accused (of being the claimed "view-generating logic") the GetBattleResult() function that generates a PvPBattleResult object, which represents the result of a player-vs-player battle. Tr. 476:24-477:17. The GetBattleResult() function is not "view-generating logic" under the Court's construction for two reasons.

**First**, the GetBattleResult() function does not generate a screen or window representation that the application chooses to display. Mr. Thompson *conceded* that the PvPBattleResult object is not a screen or window, so GetBattleResult() does not "generate a screen or window." Tr. 477:9-11. Instead, Mr. Thompson argued only that the PvPBattleResult object is data like "the number of trophies the user earned," which is "used in the rendering of [a] final winner screen." Tr. 477:5-11, 477:18-478:3. At best, then, the PvPBattleResult object is a representation of items that may be displayed in a window or screen, *not* the claimed "window representation" itself.

**Second**, even if the Court finds that the server-generated PvPBattleResult object is a "window representation," like Mr. Thompson argues, the Court's construction further requires that the "window representation" be "for display." Mr. Thompson admitted this PvPBattleResult object is **never** displayed. Tr. 526:20-527:1 ("Q. The get battle result function on the server creates a PvP battle result, but there is no rendering or drawing that happens at this function, correct? A. That's true."). Mr. Wilkman, who testified as a fact witness about how E&P works, also confirmed that the server code never generates anything that is displayed to the user. Tr. 764:19-25.

## III.    THE COURT SHOULD GRANT JMOL OR NEW TRIAL ON DAMAGES.

The jury's damages award was "not supported by substantial evidence, but" instead was "based mainly on speculation [and] guesswork" and "against the clear weight of the evidence." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1335 (Fed. Cir. 2009).

**First**, IBM wrongly included *admittedly* non-infringing revenue in its damages base for the '849 patent. Mr. Thompson admitted that pop-up offers appearing immediately after game launch do *not* infringe (Tr. 508:22-509:4). But Mr. Persechini used *all U.S. in-app revenue* for his damages base. Tr. 638:24-639:2. That is legally improper—"[d]amages should be apportioned to separate out noninfringing uses." *Niazi Licensing Corp. v. St. Jude Med. S.C.*, 30 F.4th 1339, 1357 (Fed. Cir. 2022). IBM had the burden of supporting any award with reliable evidence, but IBM

failed to introduce evidence that could allow a reasonable jury or the Court to excise these pop-up offers from the damages. The jury's damages award thus improperly included *non-infringing* uses.

At minimum, this requires a new trial that limits Mr. Persechini's damages base to infringing uses. The inclusion of non-infringing revenue was especially prejudicial because of jury instructions favoring IBM's damages theory over Zynga's, in two critical respects: (a) emphasizing that a reasonable royalty must be tied to the "use" of the invention by Zynga and (b) the overly broad "Book of Wisdom" instructions—both over Zynga's objections.

IBM weaponized the Court's instruction that damages must be "no less than a reasonable royalty *for the use made* of the invention by the infringer." Tr. 1199:3-11. Propped up by the instructions and verdict form, IBM's damages closing argument asserted that IBM's damages case was credible because it measured Zynga's "use" of the patent, while Zynga's comparable license evidence did not. *See* Tr. 1199:3-1202:15. Compounding the prejudice were the "Book of Wisdom" instructions that erroneously suggested the jury could consider any and all evidence post-dating the hypothetical negotiation, "incorrectly replac[ing] the hypothetical inquiry into what the parties would have anticipated … with a backward-looking inquiry into what turned out to have happened." *Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766, 772 (Fed. Cir. 2014).

**Second,** IBM failed to introduce evidence from which the jury could apportion damages if fewer than all 33 games infringe. IBM chose not to introduce *any* evidence of Zynga's "use" of the '849 patent for any *individual* game. The jury's verdict is therefore pure speculation, as it had no evidence from which it could apply IBM's royalty rate to any subset of infringing games.

**Third,** if Zynga does not infringe claim 8 (or it is invalid), a new trial on damages is required, because (1) the jury's verdict was premised on a finding that Zynga infringed both claim 8 *and* claim 13, (2) IBM presented separate damages theories for the claims, and (3) the verdict

did not break down the attributable amounts.[6] IBM's damages theory for the '849 patent assessed separate damages amounts for two different uses: targeted advertising (for claim 8) and concurrent display (for claim 13). For example, Dr. Martin opined that targeted advertising was tied to claim 8, not claim 13. *See* Ex. E (Martin Op. Rep.) ¶¶ 85-103; *compare id.* ¶¶ 104-111 (discussing benefits of concurrent display, as required by claims 1 and 13). And IBM never disclosed any expert theory that targeted advertising is tied to claim 13. Similarly, Dr. Martin testified at trial that "the benefit that Zynga gets from [c]laim 13" is concurrent display, while, for claim 8, he "evaluat[ed] the benefits of targeting." Tr. 673:23-674:1; 668:13-19. The jury's verdict did not specify the amount attributable to each claim nor correspond with the amounts IBM requested. Thus, if the Court finds claim 8 is not infringed or is invalid, the Court should grant a new trial on damages limited to claim 13. *Omega Pats., LLC v. CalAmp Corp.*, 920 F.3d 1337, 1350 (Fed. Cir. 2019) ("[T]he 'normal rule would require a new trial as to damages' when the jury renders a single verdict on damages and liability as to a subset of asserted claims has been set aside on appeal.").

**Fourth,** there is no substantial evidence of damages with respect to the '719 patent. IBM's damages theory was premised on an admittedly "speculative" approach. Mr. Persechini calculated damages based on a numerical value from a document relating to Farmville 3 and applied that value to E&P because he "underst[ood] from Dr. Martin that the 10 percent of revenue loss due to cheating in FarmVille 3 is supportive of the potential revenue impact of cheating in [E&P]." Tr. 649:17-650:25. But ***Dr. Martin*** admitted that it was "***speculation*** to use the impact of cheating in FarmVille on [E&P]." Tr. 664:13-16. A "jury's damages award" that is "based mainly on speculation" "is not supported by substantial evidence." *Lucent*, 580 F.3d at 1335.

---

[6] Zynga requested separate lines to try to avoid the need for a retrial on damages, *see* D.I. 524 at 6, but IBM disagreed, D.I. 526 at 4, and the Court rejected Zynga's request, *see* D.I. 528 at 6.

## IV.    THE EARLIER-ISSUED, EARLIER-EXPIRING '209 PATENT IS A PROPER OBVIOUSNESS-TYPE DOUBLE PATENTING REFERENCE.

Obviousness-type double patenting (ODP) "is a judicially created doctrine that has its roots in 35 U.S.C. § 101, which states that an inventor may obtain 'a patent' (*i.e.*, a single patent) for an invention." *In re: Cellect, LLC*, 81 F.4th 1216, 1226 (Fed. Cir. 2023). The overriding concern and "purpose of the ODP doctrine ... is to prevent patentees from obtaining a *second* patent on a patentably indistinct invention to effectively extend the life of a *first* patent to that subject matter." *Allergan USA, Inc. v. MSN Lab'ys Priv. Ltd.*, 111 F.4th 1358, 1369 (Fed. Cir. 2024).

That is what happened here: the '849 patent is a later-expiring patent that improperly extends IBM's monopoly over the invention claimed in the first-issued '209 patent. As explained, claim 13 is not patentably distinct from the '209 patent claims, and the parties have stipulated that claim 8 is not either. So if the Court agrees that the '209 patent is a proper reference, the Court should at a minimum grant JMOL that Claim 8 is invalid, and grant JMOL (§ I.B.2) or a new trial (§§ I.D., I.E., III.) as to Claim 13. The '849 patent both issued and expired ***after*** the '209 patent. Thus, the '849 patent improperly extends IBM's monopoly over the invention first claimed in the '209 patent. Had IBM been limited to the term of the '209 patent, its monopoly would have ended in January 2010, before the damages period in this case began. The only question that the Court needs to decide is whether an earlier-issued, earlier-expiring patent can invalidate later-issued, later-expiring patent claims, or whether—as IBM urges—the '209 patent's issuance from a later-filed application allows IBM to "obtain[] a time-wise extension of patent [term] for the same invention." *Cellect*, 81 F.4th at 1226. It does not, and the Federal Circuit has never held otherwise.

Instead of relying on the filing dates of the challenged patent and the reference patent, the Federal Circuit has required the reference be earlier-*issued* (for pre-URAA patents) or earlier-*expiring* (for post-URAA patents). *Novartis Pharms. Corp. v. Breckenridge Pharm. Inc.*, 909 F.3d

1355, 1362 (Fed. Cir. 2018). Because the '209 patent both *issued* and *expired* earlier than the '849 patent, it is a proper ODP reference regardless of whether the issuance or expiration date controls.

To support its position IBM relies on *Allergan*, where the Federal Circuit held that a "first-filed, first-issued, later-expiring claim cannot be invalidated by a later-filed, later-issued, earlier-expiring reference claim having a common priority date." 111 F.4th at 1369. But that is not this case because the '209 patent is the earlier-issued patent. Put differently, IBM's argument requires this Court to read the holding in *Allergan* in the disjunctive—i.e., that any *one* of the qualities is sufficient to render an ODP reference improper. But there is *no* authority for that proposition, and it would conflict with the policy animating the ODP doctrine.[7] Indeed, if filing date alone were sufficient to render a reference inapplicable, the Federal Circuit's *Allergan* decision would have had no reason to discuss the problem of a reference that was "***later-issued***."

When faced with "one pre-URAA patent" and another "post-URAA patent," "the correct framework" is to "look to the [pre-URAA patent's] *issuance date* as the reference point." *Novartis*, 909 F.3d at 1358. In *Novartis*, the post-URAA reference patent "issued after" the pre-URAA patent, and so was "not a proper [ODP] reference." *Id.* at 1358, 1361-62, 1366. The opposite is true here: the post-URAA reference ('209 patent) *issued before* the pre-URAA patent ('849 patent). So, whether the Court looks at the expiration *or* issuance date, the '209 patent is a proper reference because the '849 patent is "a second patent on a patentably indistinct invention [that] effectively extend[s] the life of a first patent to that subject matter." *Allergan*, 111 F.4th at 1369.

## V.    CONCLUSION

For the foregoing reasons, the Court should grant Zynga's motion for JMOL or new trial.

---

[7] IBM may rely on *Allergan* for the proposition "it is unsurprising that prosecution of a first-of-its-kind invention can be protracted," *id.* at 1371, but that excuse does not help IBM—the '849 patent was *not* a first-of-its-kind invention—not the first patent in the chain, nor the first issued.

Dated: October 22, 2024

Respectfully submitted,

FARNAN LLP

*/s/ Brian E. Farnan*

Brian E. Farnan (Bar. No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 777-0300
(302) 777-0301 (Fax)
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

Clement S. Roberts (admitted *pro hac vice*)
Elizabeth R. Moulton (admitted *pro hac vice*)
Will Melehani (admitted *pro hac vice*)
Sarah Mullins (admitted *pro hac vice*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
(415) 773-5700
croberts@orrick.com
emoulton@orrick.com
wmelehani@orrick.com
sarahmullins@orrick.com

Alyssa Caridis (admitted *pro hac vice*)
Geoffrey Moss (admitted *pro hac vice*)
Isaac Behnawa (admitted *pro hac vice*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
355 S. Grand Avenue, Suite 2700
Los Angeles, CA 90071
(213) 629-2020
acaridis@orrick.com
gmoss@orrick.com
ibehnawa@orrick.com

Brooks J. Kenyon (admitted *pro hac vice*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
300 West 6th Street Suite 1850
Austin, TX 78701
(512) 582-6950
bkenyon@orrick.com

31

Evan D. Brewer (admitted *pro hac vice*)
Orrick, Herrington & Sutcliffe LLP
401 Union St, Ste 3300
Seattle, WA 98101
(206) 839-4300
ebrewer@orrick.com

Richard F. Martinelli (admitted *pro hac vice*)
Joseph R. Kolker (admitted *pro hac vice*)
Orrick, Herrington & Sutcliffe LLP
51 W 52nd St
New York, NY 10019
(212) 506-5000
rmartinelli@orrick.com
jkolker@orrick.com

***Attorneys for Defendant Zynga Inc.***